DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

*Execution Copy*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is dated November 25, 2020, by and between MyHealthily Insurance Solutions LLC, a limited liability company organized under the laws of the State of Delaware ("Buyer"), and Candor USA, Inc., a corporation organized under the laws of the State of Delaware ("Seller"). Seller and Buyer are sometimes referred to herein as the "Parties" and each as a "Party."

WHEREAS, Seller desires to convey, and Buyer wishes to acquire, all of the Assets (as defined herein) on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants, promises and conditions contained herein, the Parties agree as follows:

## SECTION 1.
## DEFINITIONS

1.1    The following terms, as used in this Agreement, shall have the meanings set forth in this Section.

"Action" means any action, claim, complaint, counterclaim, suit, litigation, arbitration, governmental investigation or other legal, administrative or Tax proceeding.

"Ancillary Agreements" means the Buyer LLC Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Seller Stockholder Agreement, and any other agreement or instrument executed in connection with the consummation of the transactions contemplated hereby.

"Assets" means all properties, assets, rights, benefits and privileges both tangible and intangible, of every kind, nature and description, of Seller and all such assets acquired between the date hereof and the Closing as permitted by and subject to the terms of this Agreement (in each case other than Excluded Assets), including, but not limited to: (a) any cash or cash equivalents arising out of the operations of Seller after the date hereof, as well as the Premium Trust Amount; (b) all commissions due to Seller from Right Now Solutions; (c) Intellectual Property, (d) the Assumed Contracts, and all of Seller's rights thereunder relating to periods and events occurring on and after the Closing Date, (e) Warranties, (f) all claims, causes of action, choses in action, rights of recovery and rights of set-off of any kind relating to the Assets or the Assumed Liabilities, against any Person, including, without limitation, any liens, security interests, pledges or other rights to payment or to enforce payment in connection with products delivered or services provided by Seller on or prior to the Closing Date, (g) Books and Records of Seller relating to items (a)-(f) above, (h) Personal Property of Seller relating to items (a)-(f) above, and (i) all other assets of Seller that are reasonably necessary to make use of items (a)-(h) above.

"Assignment and Assumption Agreement" means the assignment and assumption agreement in the form attached hereto as Exhibit A.

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

"Assumed Contracts" means all rights of Seller or others under all agreements, contracts or leases set forth on Schedule 1.1A.

"Bill of Sale" means the bill of sale in the form attached hereto as Exhibit B.

"Blue Toque Note" means that certain convertible promissory note issued by Seller to Blue Toque Investments LLC pursuant to that certain Note Purchase Agreement entered into by Seller and Todd Crick on October 1, 2020.

"Books and Records" means all of the written and electronic books and records of Seller (other than any Excluded Assets), including but not limited to all books of account, customer lists, supplier lists, computer programs and software, employee personnel files, engineering data, purchase orders, service logs, consultants' reports, budgets, marketing data, financial reports and projections, and sales, operating, and business plans, relating to or used in the Business and not pertaining solely to Seller's internal corporate affairs.

"Business" means Seller's business.

"Business Day" means any day, other than a Saturday or a Sunday, on which commercial banks are required to be open in New York, New York.

"Buyer LLC Agreement" means the limited liability company agreement of Buyer in the form attached hereto as Exhibit C.

"Buyer Units" means the 1,100,000 Class A Common Units of Buyer included in the Purchase Price.

"Closing" means the consummation of transactions contemplated by this Agreement, including the assignment, transfer, conveyance and delivery of the Assets and the Purchase Price as contemplated hereunder.

"Closing Date" means the date hereof or such other date as Buyer and Seller may agree.

"Code" means the Internal Revenue Code of 1986, as amended.

"Compensation Arrangement" means any plan or compensation arrangement other than an Employee Plan which provides to Employees, former Employees, officers, directors or shareholders of Seller or any ERISA Affiliate, any compensation or other benefits, whether deferred or not, in excess of base salary, sales commissions or wages (excluding overtime pay), including any bonus or incentive plan, stock rights plan, deferred compensation arrangement, life insurance, stock purchase plan, severance pay plan, employment or consulting agreement and any other employee fringe benefit plan.

"Consents" means the consents of other contracting parties to the assignment of the Assumed Contracts requiring such consent, including the Consents listed on Schedule 1.1B.

"Creditor Claims" means Claims or Actions by creditors or purported creditors of Seller against Buyer based upon any legal theory or equitable principle.

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

"Dollar" or "$" means United States Dollar.

"EIDL Loan" means the Economic Injury Disaster Loan from the SBA to Seller evidenced in the original principal amount of $150,000, which is evidenced by that certain Loan Authorization and Agreement, dated May 16, 2020, by and between Seller and the SBA.

"Employee Plan" means any pension, retirement, profit-sharing, deferred compensation, vacation, severance, bonus, incentive, medical, vision, dental, disability, life insurance or other employee benefit plan as defined in Section 3(3) of ERISA (whether or not subject to ERISA) to which any ERISA Affiliate contributes or has contributed or which either of Seller or any ERISA Affiliate sponsors or maintains (or has sponsored or maintained), or pursuant to which Seller or any ERISA Affiliate has any Liability and which provides benefits to any Employee, director or consultant of Seller.

"Employees" means the persons employed by Seller on a full or part-time basis.

"Enforceability Exceptions" means the exceptions or limitations to the enforceability of contracts under bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally, and by the application of general principles of equity.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity which is (or at any relevant time was) a member of a "controlled group of corporations" with or under "common control" with Seller as defined in Section 414(b) or (c) of the Code.

"Excluded Assets" means (i)  cash and cash equivalents of Seller, (ii) refunds or credits (including interest thereon or claims therefrom) of Taxes paid by Seller prior to the Closing Date, (iii) refunds of premiums paid on, and rights and claims under, insurance policies relating to events occurring prior to the Closing Date, (iv) bonds, letters of credit, surety instruments and other similar items (other than amounts posted by parties to Assumed Contracts as deposits or other security) held by Seller, (v) Seller's company and tax records and the account books of original entry, general ledger and financial records (*provided* that Seller shall provide Buyer with a copy of any such records that Buyer shall reasonably request), (vi) the Non-Assumed Contracts, and (vii) such additional assets as are set forth on Schedule 1.1C.

"GAAP" means United States generally accepted accounting principles as currently in effect.

"Governmental Authority" means any court or any federal, state, county, local or foreign governmental, legislative or regulatory body, agency, department, authority, instrumentality or other subdivision thereof.

"Intellectual Property" means all trademarks, trademark applications, patents, patent applications, service marks, service mark applications, trade names, copyrights, copyright applications, licenses, domain names, call letters, trade secrets, inventions, know-how, formulae, processes, procedures, computer software and other intellectual property rights, including any

- 3 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

pending applications of each of the foregoing, which are owned, licensed or otherwise held by Seller, other than Intellectual Property solely related to Excluded Assets.

"knowledge" or "to the knowledge" of Seller means the actual knowledge of Ken Anketell, Jim Prokes and Matthew Applestein after a reasonable investigation using commercially reasonable, good faith efforts.

"Law" means any statute, ordinance, code, law, rule, regulation, permit or permit condition, or other requirement, standard, policy or procedure enacted, adopted or applied by any Governmental Authority.

"Liabilities" means claims, obligations, commitments or liabilities of a Person of any nature, absolute, accrued, contingent or otherwise, known or unknown, whether matured or unmatured, and whether or not required to be disclosed on a balance sheet prepared in accordance with GAAP.

"Licenses" means the licenses, permits, franchises, registrations, authorizations, consents or approvals issued by any Governmental Authority to Seller.

"Lien" means any lien, pledge, charge, easement, security interest, mortgage, deed of trust, right-of-way or other encumbrance.

"Material Adverse Effect" means any event, circumstance or condition that, individually or when aggregated with all other similar events, circumstances or conditions, would reasonably be expected to have a material adverse effect on: (i) with respect to Seller, the property (including Intellectual Property), operations, condition (financial or otherwise) or results of operations of Seller, or the ability of Seller to consummate the transactions contemplated hereby, and, (ii) with respect to Buyer, the ability of Buyer to consummate the transactions contemplated hereby; *provided,* that none of the following shall be deemed, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been, or would reasonably be expected to be a Material Adverse Effect: (1) any adverse change, effect, event, occurrence, development, matter, state of facts, series of events or circumstance (any such item, an "Effect") arising out of or relating to (x) United States or global (or any region thereof) (A) economic, credit, financial or securities market conditions, including prevailing interest rates or currency rates, or (B) regulatory or political conditions, including, but not limited to, the shutdown (whether short-term or long-term) of any governmental services or instrumentalities, or (y) acts of terrorism or sabotage, the outbreak, escalation or worsening of hostilities (whether or not pursuant to the declaration of a national emergency or war), man-made disasters, natural disasters (including hurricanes), or acts of God, pandemics or disease outbreaks, including the COVID-19 virus, or (2) any adverse Effect arising out of, resulting from or attributable to the execution and delivery of this Agreement or the announcement, pendency or consummation of any of the transactions contemplated by this Agreement.

"Non-Assumed Contracts" means all contracts of Seller other than the Assumed Contracts.

"Permitted Liens" means (i) statutory landlord's liens and liens for current Taxes not yet due and payable (or being contested in good faith) and (ii) any Liens set forth in Schedule 1.1E.

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

"Person" means any person or entity, whether an individual, trustee, corporation, general partnership, limited partnership, trust, unincorporated organization, business association, firm, joint venture or Governmental Authority.

"Personal Property" means all the fixed and tangible personal property of Seller including, but not limited to, the equipment, hardware, software and furnishings listed on Schedule 1.1F, together with any replacements, improvements, or additions thereto made between the date hereof and the Closing Date

"PPP Loan" means the Paycheck Protection Program loan from the SBA to Seller in the original principal amount of $245,000.

"Premium Trust Amount" means the aggregate amount deposited as of the Closing in the premium trust accounts of Seller, which are designated by Seller as the PTA and RNS accounts.

"SBA" means the United States Small Business Administration.

"SBA Consent" means the written consent of the SBA required for Seller to convey the Assets to Buyer and for Buyer to assume the EIDL Loan and the PPP Loan.

"Seller Stockholder Agreement" means an agreement between Buyer and the Seller's stockholders in form and substance acceptable to Buyer under which Seller's stockholders agree to indemnify and hold harmless Buyer against any and all Creditor Claims and any Actions relating to Seller.

"Seller Stockholder Approval" means the approval by Seller's stockholders of the transactions contemplated by this Agreement and the Ancillary Agreements required by Delaware law and Seller's organizational documents.

"Taxes" means any taxes, charges, fees, levies or other assessments, including income, excise, use, transfer, payroll, occupancy, property, sales, franchise, unemployment and withholding taxes, penalties and interest imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof.

"Warranties" means all rights under or pursuant to all warranties, representations, and guarantees made by suppliers in connection with the Assets or services furnished to Seller.

1.2    Terms Defined Elsewhere in this Agreement.  The following is a list of defined terms used in this Agreement and not defined in the preamble, recitals and Section 1.1, with reference to the Section in which such term is defined:

| Term | Section |
| --- | --- |
| Assumed Liabilities | 2.3 |
| Buyer Indemnified Parties | 9.2 |

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

| Term | Section |
|------|---------|
| Claim | 9.2(a) |
| Financial Statements | 4.8 |
| Indemnification Notice | 9.3(a) |
| Indemnified Party | 7.3(a) |
| Indemnifying Party | 9.3(a) |
| Indemnity Period | 9.1 |
| Losses | 9.2(a) |
| Non-Assumed Liabilities | 2.3 |
| Purchase Price | 2.2 |
| Seller Indemnified Parties | 9.2(b) |
| Seller Note | 2.2(a) |

1.3   Clarifications. Words used in this Agreement, regardless of the gender and number specifically used, shall be deemed and construed to include any other gender and any other number as the context requires.   As used in this Agreement, the word "including" is not limiting, and the word "or" is both conjunctive and disjunctive. Except as specifically otherwise provided in this Agreement in a particular instance, a reference to a Section, Schedule or Exhibit is a reference to a Section of this Agreement or a Schedule or Exhibit hereto, and the terms "hereof," "herein," and other like terms refer to this Agreement as a whole, including the Schedules and Exhibits to this Agreement, and not solely to any particular part of this Agreement.   The descriptive headings in this Agreement are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

SECTION 2.
PURCHASE OF ASSETS

2.1   Agreement to Sell and Buy.   Subject to the terms and conditions herein, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Buyer all of Seller's right, title and interest in and to the Assets, and Buyer shall purchase, acquire and accept from Seller all of Seller's right, title and interest in and to the Assets, free and clear of all Liens, other than Permitted Liens, and all Creditor Claims.

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

2.2   <u>Payment of Purchase Price</u>.  The purchase price for the Assets shall be as follows (the "<u>Purchase Price</u>").

    (a)   Assignment by Buyer to Seller of that certain Amended and Restated Senior Secured Promissory Note, in the principal of up to $300,000, issued by Seller to Buyer (the "<u>Seller Note</u>");

    (b)   The Buyer Units; and

    (c)   Assumption by Buyer of the EIDL Loan, the PPP Loan, and the other Assumed Liabilities.

2.3   <u>Assumed Liabilities.</u>  At and after the Closing, Buyer shall assume and timely pay, discharge and perform when due: (a) those Liabilities attributable to periods after the Closing under or with respect to the Assumed Contracts and (b) the EIDL Loan, the PPP Loan, the Blue Toque Note (if and only if the condition set forth in <u>Section 7.2(e)</u> is satisfied), and any Liabilities set forth on <u>Schedule 2.3</u> (collectively, the "<u>Assumed Liabilities</u>").   All other Liabilities shall be "<u>Non-Assumed Liabilities</u>" and shall remain and be the obligations and liabilities solely of Seller and shall include the following: (i) any Liabilities of Seller for Taxes relating to periods prior to the Closing, whether or not shown on a Tax Return, (ii) any Liabilities of Seller for Taxes payable with respect to Seller's transfer of the Assets to Buyer and Seller's consummation of the other transactions contemplated by this Agreement; (iii) any Liabilities for legal, accounting or broker's fees incurred by Seller in connection with this Agreement and the consummation of the transactions contemplated hereby, and (iv) any Liabilities of Seller arising under this Agreement.

SECTION 3.
REPRESENTATIONS AND WARRANTIES OF SELLER

    Seller hereby represents and warrants to Buyer as follows as of the date hereof and as of the Closing Date:

3.1   <u>Organization and Authority</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and qualified to do business in any other jurisdiction in which the nature of the Business or the ownership of the Assets requires such qualification.  Seller has all requisite corporate power and authority (a) to execute, deliver and perform this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby, and (b) to own, lease and operate the Assets and to carry on the Business as now being conducted and proposed to be conducted.

3.2   <u>Authorization and Binding Obligations</u>.  The execution, delivery and performance of this Agreement and each Ancillary Agreement to which Seller is or will be a party have been duly and validly authorized by all necessary corporate action of Seller.  This Agreement and each Ancillary Agreement has been duly executed and delivered by Seller and constitutes a valid and binding agreement of Seller enforceable against it

- 7 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

in accordance with its terms, except as its enforceability may be limited by Enforceability Exceptions.

3.3   <u>No Contravention; Consents</u>.   Subject to obtaining the Consents set forth on <u>Schedules 1.1A</u> and <u>1.1B</u> and except for the other restrictions set forth on <u>Schedules 1.1A</u> and <u>1.1B</u>, the execution, delivery and performance of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby by Seller will not, after the giving of notice, or the lapse of time, or otherwise (a) violate the organizational documents of Seller, (b) result in the breach of, constitute a default under, or result in the creation of any Lien upon any of the Assets under any Assumed Contract, or (c) violate any Laws applicable to Seller, the Business or any of the Assets.   Except for the SBA Consent, the Seller Stockholder Agreement and the Consents set forth on <u>Schedules 1.1A</u> and <u>1.1B</u>, no material consent, approval, or authorization of any Governmental Authorities or other third party is required by Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements.

3.4   <u>Title to Assets</u>.   Seller has good and marketable title to or a valid leasehold interest in, or otherwise has the right to use, all of the Assets, free and clear in the case of assets owned by Seller of any Liens except for Permitted Liens.   The Assets include all assets necessary to conduct the Business as presently conducted.

3.5   <u>Assumed Contracts</u>.   <u>Schedule 1.1A</u> is a list of all Assumed Contracts as of the date of this Agreement.   Each Assumed Contract is in full force and effect, and is valid, binding and enforceable against the Seller and, to Seller's knowledge, each other party thereto in accordance with its terms.   Except as set forth on <u>Schedules 1.1A</u> and <u>1.1B</u>, no Assumed Contract requires the Consent of any other contracting party to the transactions contemplated by this Agreement.   Seller is not and, to Seller's knowledge, no other party is in breach or default under any Assumed Contract, and no event has occurred and no condition exists which, with the passage of time or the giving of notice or both, would constitute such a breach or default by Seller or, to Seller's knowledge, any other party thereto.   True and complete copies of each Assumed Contract have been delivered to Buyer.

3.6   <u>Intellectual Property</u>.   <u>Schedule 3.6</u> contains a description of the Intellectual Property, all of which is owned by Seller, valid and uncontested.   Seller is the exclusive owner of, and has the right to use exclusively, all trademarks and domain names used in connection with the operation or conduct of the Business or operations or the provision of any service by it.   Seller has not transferred ownership of or granted any license of or right to use or authorized the retention of any right to use any Intellectual Property that is or was Intellectual Property owned by, licensed to or by or developed or created by or on behalf of Seller, to any other Person.   The Assumed Contracts include all contracts, commitments and licenses to which Seller is a party with respect to any Intellectual Property of any Person other than Seller.   No Person other than Seller has ownership rights to improvements made by or on behalf of Seller in Intellectual Property which has been licensed to Seller.   Seller is not infringing upon or otherwise acting adversely to any trademarks, trade names, copyrights or similar intellectual

- 8 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

property rights owned by any other Person. To Seller's knowledge, no other Person is infringing upon or otherwise acting adversely with respect to any Intellectual Property. Seller has taken reasonable steps in accordance with normal industry practice to protect its respective rights in its respective confidential information and trade secrets or confidential information or trade secrets provided by any other Person to Seller. No part or component of Seller's software contains any code that is owned by any third party, including any code that is licensed pursuant to the provisions of any "open source" or "public" license agreement or any other license agreement that requires source code to be distributed or made available in connection with the distribution of the licensed software in object code form or that limits the amount of fees that may be charged in connection with sublicensing or distributing such licensed software (each, an "Open Source License"). Further, none of Seller's software, as a result of the intermingling or integration of code owned by Seller with any "open source" software licensed under any Open Source License, in whole or in part, has imposed upon it any material limitation, restriction, or condition on the right or ability of Seller to use, distribute, license or sell its software; provided, that the inclusion of copyright notices shall not be considered such a limitation, restriction or condition.

3.7   Employees.

   (a)   Schedule 3.7 contains an accurate list of all Employees, and showing each such Employee's present position, start date, annual salary or wages and any other compensation. Schedule 3.7 also contains a list of any consultants or independent contractors providing services to Seller and a description of any agreements of Seller therewith.

   (b)   Seller acknowledges that Seller shall be responsible for satisfying in full all amounts owed to past and present Employees, including wages, salaries, severance pay, sick pay, accrued vacation, any employment, incentive, compensation or bonus agreements and any other benefits or payments pursuant to the terms of any Compensation Arrangement and Employee Plan relating to the period of employment by Seller (and ending on the Closing Date).

3.8   Financial Information. Schedule 3.8 comprises a true and complete copy of the reviewed balance sheets and statements of income as at the end of and for the twelve-month period ended December 31, 2019 and at the end of and for the nine-month period ended September 30 2020, and the unaudited financial statements as at the end of and for the nine-month period ended September 30, 2020 (the "Financial Statements"). Except as set forth on Schedule 3.8, the Financial Statements have been prepared in accordance with GAAP consistent with past practices, are based on the Books and Records of Seller and present fairly, in all material respects, the financial condition and results of operations of Seller at the end of and for the twelve-month period ended December 31, 2019 and the nine-month period ended September 30, 2020. Seller is not subject, with respect to the Assets, to any Liability required in accordance with GAAP to be disclosed on a balance sheet of Seller that is not shown or reserved for in the September 30, 2020 balance sheet included in the Financial

- 9 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

Statements, other than (i) Liabilities incurred in the ordinary course of business since September 30, 2020, and (ii) Liabilities set forth on <u>Schedule 3.8</u>.  <u>Schedule 3.8</u> sets forth all creditors of Seller and all Liabilities to each such creditor.  Seller has filed with the SBA all documents necessary to duly apply for forgiveness of the entire obligation under the PPP Loan and there is no factual or legal basis for the SBA to fail to forgive the full amount of the PPP Loan.

3.9     <u>Absence of Changes</u>.  Since September 30, 2020, except as disclosed on <u>Schedule 3.9</u>, there has not been any:

(a)     amendment, cancellation, or termination of any contract, license, or other instrument material to Seller or the Business;

(b)     sale, assignment, or transfer of any material assets of Seller other than in the ordinary course of business;

(c)     waiver of any rights of substantial value to Seller other than, in the case of accounts receivable, in the ordinary course of business and so as not to exceed Seller's reserve for bad debt as reflected in Seller's most recent balance sheet;

(d)     increase in the compensation payable to any of Seller's officers, employees, or agents;

(e)     bonus, incentive compensation, service award, or other like benefit granted, made or accrued, contingently or otherwise, for or to the credit of any of officer, employee, or agent of Seller;

(f)     employee welfare, pension, retirement, profit-sharing or similar payment or arrangement made or agreed to by Seller for any officer, employee, or agent of Seller except pursuant to existing plans and arrangements already disclosed to Buyer;

(g)     new employment agreement to which Seller is a party;

(h)     addition to or modification of the Employee Plans of Seller or arrangements or practices affecting employees other than (i) contributions made for 2020 in accordance with the normal practices of Seller or (ii) extensions of coverage to other employees who became eligible after September 30, 2020;

(i)     failure to operate the Business in the ordinary course or to use reasonable efforts to preserve the Business intact, to keep available the services of all officers, employees, or agents of Seller, and to preserve the goodwill of Seller's suppliers, customers and others having business relations with Seller;

(j)     change in accounting methods or practices by Seller; or

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

(k)     Material Adverse Effect experienced by Seller.

3.10    <u>Taxes</u>.  Seller has filed, or caused to be filed, with the appropriate Governmental Authority, all required Tax returns, and Seller has paid, caused to be paid or accrued all Taxes shown to be due and payable or claimed to be due and payable thereon, except where the failure to file such returns or pay or accrue such Taxes could not reasonably be expected to result in a Lien on the Assets or in the imposition of transferee liability on Buyer for the payment of such Taxes.  Seller has no liability material in amount for any Taxes due and owing, and there are no proceedings pending pursuant to which Seller is or could be made liable for any Taxes, penalties, interest, or other charges, the liability for which would extend to Buyer as transferee of the Assets or as owner of the Business following the Closing.

3.11    <u>Claims and Litigation</u>.  Except as set forth on <u>Schedule 3.11</u>, there are no Actions pending or, to Seller's knowledge, threatened by or against Seller or relating to the transactions contemplated by this Agreement or the Ancillary Agreements.

3.12    <u>Insurance</u>.  <u>Schedule 3.12</u> sets forth a true and correct list of all insurance policies maintained by or for the benefit of Seller, all of which are in full force and effect as of the date hereof.

3.13    <u>Compliance with Laws</u>.  Except as set forth in <u>Schedule 3.13</u>, Seller is in compliance with all Laws and Licenses.

3.14    <u>Brokers</u>.  Seller has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Seller which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Assets or the Business.

3.15    <u>Full Disclosure</u>.  No representation or warranty of Seller contained in this Agreement, and none of the statements or information concerning Seller, the Business or the Assets contained in this Agreement, the Ancillary Agreements or the exhibits and the schedules hereto, contains any untrue statement of a material fact nor do such representations, warranties, covenants or statements taken as a whole omit a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

SECTION 4.
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows as of the date hereof and as of the Closing Date:

4.1     <u>Organization and Authority</u>.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has all requisite limited liability company power and authority to execute, deliver and perform this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby and thereby.

- 11 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

4.2    Authorization and Binding Obligations.  The execution, delivery and performance of this Agreement by Buyer and each Ancillary Agreement to which Buyer is or will be a party have been duly and validly authorized by all necessary limited liability company action.  This Agreement and each Ancillary Agreement to which Buyer is or will be a party has been (or when delivered will be) duly executed and delivered by Buyer and constitutes (or will constitute) a valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms, except as its enforceability may be limited by Enforceability Exceptions.

4.3    No Contravention; Consents.  The execution, delivery and performance of this Agreement and each Ancillary Agreement, the consummation of the transactions contemplated hereby and thereby and the compliance with the provisions hereof and thereof by Buyer will not (a) violate the organizational documents of Buyer, (b) violate any Laws applicable to Buyer, (c) require the consent of any third party, or (d) violate, be in conflict with, or constitute a default under any contract or agreement to which Buyer is a party, such that Buyer cannot perform its obligations hereunder.

4.4    Brokers.  Buyer has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Buyer which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Assets or the Business.

SECTION 5.<br>PRE-CLOSING COVENANTS

5.1    Covenants of Seller.  Seller covenants and agrees, from and after the execution and delivery of this Agreement, to and including the Closing Date as follows:

(a)    Commercially Reasonable Efforts.  Seller shall use commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated in accordance with the terms hereof. Seller shall make all filings with and give all notices to third parties that may be reasonably necessary of Seller in order to consummate the transactions contemplated hereby.  Without limiting the generality of the foregoing, Seller, in consultation with Buyer, shall take any and all actions necessary or advisable to achieve forgiveness of the full amount of the PPP Loan.

(b)    Buyer Operational Control.  Beginning on the date hereof and ending on the earlier to occur of the Closing or the termination of this Agreement, Seller hereby delegates to Buyer, and covenants and agrees that Buyer shall have, full operational control of the business of Seller.  Such operational control shall not extend to arrangements of Seller relating to Liabilities of Seller that are Non-Assumed Liabilities, which shall be remain in Seller's control.  Seller agrees that neither Buyer nor Michael Malhame will have any liability with respect to any exercise of the control over Seller given to Buyer in this Section 5.1(b) and Seller shall

- 12 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

indemnify, defend and hold harmless Buyer and Michael Malhame from and against any such liability; provided, however, that the foregoing shall not relieve Buyer or Michael Malhame from any liability for any illegal conduct or willful misconduct of Buyer or Michael Malhame.

(c)   <u>Access</u>.  Seller shall give to Buyer and its agents reasonable access during normal business hours to all of Seller's personnel, premises, properties, assets, financial statements and records, books, contracts, documents and commitments of or relating to the Business, and shall furnish Buyer with all such information concerning the Business as Buyer reasonably may request.

(d)   <u>Ordinary Course</u>.  Unless approved by Buyer in writing or effected by Buyer pursuant to <u>Section 5.1(b)</u>, Seller shall conduct the Business and preserve and maintain the Assets in good working order and condition, subject to normal wear and tear, in the ordinary course of business consistent with past practice, including maintaining existing insurance policies on the Assets as in effect on the date hereof.  Seller shall use commercially reasonable efforts to keep its organization intact, to preserve the Business, and to preserve the goodwill of suppliers, customers, landlords, Governmental Authorities and others dealing with Seller. Seller's Books and Records shall be maintained in accordance with GAAP, in a manner consistent with past practice.

(e)   <u>Adverse Developments</u>.  Seller shall promptly notify Buyer of any unusual or materially adverse developments that occur prior to Closing with respect to the Assets or the operation of the Business. No disclosure shall relieve Seller of any obligation with respect to any representation, warranty, or covenant of Seller in this Agreement or waive any condition to Buyer's obligations under this Agreement.

(f)   <u>Compliance with Laws</u>.  Seller shall comply in all material respects with all Laws applicable to Seller or the Business.

(g)   <u>Contracts and Liens</u>.  Seller shall not create, assume, consent to or suffer to exist any Lien on any of the Assets (other than Permitted Liens). Unless Buyer shall have given its prior written consent or effected by Buyer pursuant to <u>Section 5.1(b)</u>, Seller shall not enter into any new contract, agreement or lease or incur any obligation (including obligations arising from the amendment of any existing contract, agreement or lease) that will be binding on Buyer after the Closing.

(h)   <u>No Solicitation</u>.  Seller shall not, and shall cause its officers, directors, Employees, agents, representatives, equity holders and affiliates not to, (i) sell, transfer, lease, assign or otherwise dispose of or distribute any of the Assets (other than the disposal of worn out or obsolete Assets in the ordinary course of business consistent with past practice) or voting control

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

of Seller (whether pursuant to merger, acquisition, consolidation, reorganization, recapitalization or otherwise) to any Person (other than Buyer), (ii) solicit, encourage, entertain, negotiate or enter into with any Person any transaction or agreement of the nature described in clause (i) above, or (iii) provide any non-public information about the Business to any Person.  Seller shall promptly (but in any event within two Business Days) notify Buyer if any discussions or negotiations regarding a transaction of the nature described in clause (i) above are sought to be initiated, or if a Person makes any inquiry or proposal, or requests information, with a view, as reasonably determined by Seller, toward making such a proposal or offer with respect to the Business, the Assets or Seller, in each case together with the identity of the Person making such proposal or offer and the material terms thereof.

5.2   <u>Covenants of Buyer</u>.  Buyer covenants and agrees that from and after the execution and delivery of this Agreement to and including the Closing Date Buyer shall use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated in accordance with the terms hereof.

SECTION 6.
COVENANTS

6.1   <u>PPP Loan; Premium Reconciliation</u>.

(a)   If the SBA does not forgive the full amount of the PPP Loan, Seller agrees that Buyer shall issue to ANAN Holdings LLC (or a member of Buyer controlled by it that it designates) a number of preferred units of Buyer (which units are valued based upon a valuation of Buyer of $5,000,000) having a value equal to the amount of obligations under the PPP Loan that are not forgiven by the SBA, rounded up to the next whole preferred unit.

(b)   Following the Closing, Buyer shall prepare a premium reconciliation report setting forth the amount of premiums required to be held in trust by Seller as of the Closing (the "<u>Required Premium Amount</u>").  If the Required Premium Amount is less than the Premium Trust Amount, then Seller agrees that Buyer shall issue to ANAN Holdings LLC (or a member of Buyer controlled by it that it designates) a number of preferred units of Buyer, which units are valued based upon a valuation of Buyer of $5,000,000) having a value equal to the amount of the Required Premium Amount less the Premium Trust Amount, rounded up to the next whole preferred unit.

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

(c)    If between the date hereof and the Closing, Buyer makes advances to Seller to pay expenses of Seller (or if Buyer directly pays such expenses) after the maximum advances permitted under the Seller Note have been made, then Seller agrees that Buyer shall issue to ANAN Holdings LLC (or a member of Buyer controlled by it that it designates) a number of preferred units of Buyer (which units are valued based upon a valuation of Buyer of $10,000,000) having a value equal to the aggregate amount of such advances and payments, rounded up to the next whole preferred unit.

6.2    <u>Employee Matters</u>.  As requested by Buyer, Seller shall terminate the employment of any employee set forth <u>Schedule 3.7</u> effective as of the Closing to enable such employee to be hired by Buyer.    At Buyer's request, any employment, non-competition, confidentiality or similar agreement between any employee hired by Buyer will be assigned by Seller to Buyer.

6.3    <u>Confidentiality</u>.    Except as necessary for the consummation of the transaction contemplated hereby, and except as and to the extent required by Law, each Party will keep confidential all information obtained from the other Party in connection with the transactions contemplated by this Agreement (unless such information thereafter becomes generally available to the public, is otherwise available to it on a non-confidential basis from another source, or has been developed independently by it).  If this Agreement is terminated, each Party will, upon request, return all information obtained from the other Party in connection with the transactions contemplated by this Agreement.    This does not however prevent either party from undertaking public relations exercises relating to the transaction once this agreement is signed, providing that any mention by name of the Buyer or of the identity of the owners of shares in the Seller is first approved by both parties.

6.4    <u>Allocation of Purchase Price</u>.  Within 60 days following the Closing, Buyer and Seller shall agree on the allocation of the Purchase Price in accordance with the rules under Section 1060 of the Code.  No filings made by either Party with any taxing or other authority shall reflect an allocation other than in the manner agreed upon and each Party shall timely make all filings required by any taxing authority, including the filing of Internal Revenue Service Form 8594.

6.5    <u>Bulk Sales</u>.  Seller and Buyer hereby waive compliance by the other with bulk sales Laws applicable to the transactions contemplated hereby.

6.6    <u>Further Assurances</u>.  The Parties will take all appropriate and commercially reasonable actions and execute all documents, instruments or conveyances of any kind that may be reasonably necessary or advisable to perform and carry out any of the provisions hereof and of the Ancillary Agreements.

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

## SECTION 7.
## THE CLOSING

7.1   <u>The Closing</u>.  At the Closing, which shall take place as soon as reasonably possible following the fulfillment of the conditions set forth in <u>Sections 7.2</u> and <u>7</u>.3 at such location agreed to by the Parties, Seller shall make such deliveries as are set forth in <u>Section 7.2(c)</u>, and Buyer shall make such deliveries as are set forth in <u>Section 7.3(b)</u>. All transactions at Closing are deemed to have taken place simultaneously and no transaction shall be deemed to have been completed, nor shall any document be deemed to have been delivered, until all transactions shall have been completed and all documents delivered.  Immediately following the Closing, Seller shall pay the Premium Trust Amount to a premium trust account designated by Buyer.

7.2   <u>Conditions of Buyer's Obligation to Close</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

(a)   All representations and warranties of Seller contained in this Agreement shall be true and complete at and as of the Closing Date in all material respects as if such representations and warranties were made at and as of the Closing Date, except for (a) any representation or warranty that is expressly stated only as of a specified earlier date, in which case such representation or warranty shall be true as of such earlier date, or (b) changes in any representation or warranty that are permitted by this Agreement; and Seller shall have performed, in all material respects, all agreements and covenants required hereby to be performed by Seller prior to or on the Closing Date.

(b)   Seller shall have obtained the Seller Stockholder Approval.

(c)   All commissions due to MJM Global Insurance Brokerage Group as of the Closing shall have been paid in full by Seller to MJM Global Insurance Brokerage Group.

(d)   The Blue Toque Note shall have been amended to remove the conversion features thereof, reduce the interest rate thereon to 8% per annum, and extend the maturity date to two years following the Closing.

(e)   As of the Closing Date, Seller shall not have suffered a Material Adverse Effect.

(f)   Seller shall have delivered to Buyer:

(i)   The Bill of Sale and Assignment and Assumption Agreement duly executed by Seller;

(ii)   The Buyer LLC Agreement duly executed by Seller;

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

(iii) An assignment of trademarks with respect to the trademarks and trademark applications included in the Intellectual Property, in customary form, as shall be mutually agreed to by the Parties duly executed by Seller;

(iv) An assignment of patents with respect to the patents and patent applications included in the Intellectual Property in customary form, as shall be mutually agreed to by the Parties duly executed by Seller;

(v) Such other good and sufficient instruments of conveyance and transfer as are reasonably necessary to vest in Buyer good and valid title to the Assumed Assets, free and clear of all Liens other the Permitted Liens and all Creditor Claims;

(vi) The Seller Stockholder Agreement duly executed by Seller's stockholders;

(vii) A copy of a document evidencing the SBA Consent;

(viii) A copy of each document evidencing each Consent that is designated by Buyer on Schedule 1.1C as being a "Required Consent" shall have been obtained without any material adverse change in the terms or conditions of each Assumed Contract to which such Consent relates from those in effect on the date hereof and in a form reasonably acceptable to Buyer.

(ix) A certificate of Seller attesting that all representations and warranties of Seller contained in this Agreement shall be true and complete in all material respects at and as of the Closing Date and that Seller has performed, in all material respects, all agreements and covenants required hereby to be performed by Seller prior to or on the Closing Date;

(x) A copy of the resolutions of Seller's board of directors approving the transactions contemplated by this Agreement; and

(xi) Such other documents reasonably requested by Buyer to give effect to the transactions contemplated by this Agreement.

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

7.3   <u>Conditions of Seller's Obligation to Close</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

      (a)   All representations and warranties of Buyer contained in this Agreement shall be true and complete at and as of the Closing Date in all material respects as if such representations and warranties were made at and as of the Closing Date, except for (a)  any representation or warranty that is expressly stated only as of a specified earlier date, in which case such representation or warranty shall be true as of such earlier date, or (b) changes in any representation or warranty that are permitted by this Agreement; and Buyer shall have performed, in all material respects, all agreements and covenants required hereby to be performed by Buyer prior to or on the Closing Date.

      (b)   Seller shall have obtained the Seller Stockholder Approval.

      (c)   Buyer shall have delivered to Seller:

      (i)   The Seller Note duly endorsed for assignment to Seller;

      (ii)   An Assignment and Assumption Agreement duly executed by Buyer;

      (iii)   The Buyer LLC Agreement duly executed by Buyer;

      (iv)   The Seller Stockholder Agreement duly executed by Buyer;

      (v)   A certificate of Buyer attesting that all representations and warranties of Buyer contained in this Agreement shall be true and complete at and as of the Closing Date and that Buyer has performed, in all material respects, all agreements and covenants required hereby to be performed by Seller prior to or on the Closing Date;

      (vi)   A copy of the resolutions of Buyer approving the transactions contemplated by this Agreement; and

      (vii)   Such other documents reasonably requested by Seller to give effect to the transactions contemplated by this Agreement.

### SECTION 8.
### TERMINATION

8.1   <u>Termination by the Parties</u>.  Prior to the Closing, this Agreement may be terminated by mutual consent of Buyer and Seller or, upon written notice to the non-terminating Party, upon the occurrence of any of the following:

      (a)   <u>Breach by Seller</u>.  By Buyer (if Buyer is not then in material breach of this Agreement) in the event of a material breach of this Agreement by Seller

- 18 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

such that if the Closing Date were the date of determination of such breach, any condition in <u>Section 7.2</u> would not be satisfied;

(b)    <u>Breach by Buyer</u>.  By Seller (if Seller is not then in material breach of this Agreement) in the event of a material breach of this Agreement by Buyer such that if the Closing Date were the date of determination of such breach, any condition in <u>Section 7.3</u> would not be satisfied;

(c)    <u>Closing Conditions Not Satisfied</u>.  By either Buyer or Seller if either (i) any condition to such Party's obligation to effect the Closing (other than the failure to make a delivery that is not required to be made until the Closing) is not satisfied or waived prior to December __, 2020, or (ii) any condition to such Party's obligation to effect the Closing will not be satisfied on or prior to December __, 2020; *provided, however*, that the right to terminate this Agreement under this <u>Section 8.1(c)</u> shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of a condition to the Closing to be satisfied or capable of being satisfied on or prior to such date; or

(d)    <u>Order</u>.  By either Buyer or Seller in the event that any Governmental Authority shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and nonappealable.

8.2    <u>Effect of Termination</u>.  Upon termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement will forthwith become null and void and there will be no liability or obligation on the part of any Party (or any of their respective officers, directors, employees, representatives or affiliates).

8.3    <u>Surviving Obligations</u>.  The rights and obligations of the Parties described in <u>Sections 6.3 and 10</u> and this <u>Section 8</u> shall survive any termination of this Agreement.

## SECTION 9. INDEMNIFICATION

9.1    <u>Survival</u>.  The representations and warranties of Seller and Buyer in this Agreement shall survive the Closing for 12 months following the Closing Date (the "<u>Indemnity Period</u>"), except that (a) the representations and warranties of Seller set forth in <u>Sections 3.1</u> (Organization and Authority), <u>3.2</u> (Authorization and Binding Obligations), <u>3.3</u> (No Contravention; Consents), <u>3.4</u> (Title to Assets), <u>3.6</u> (Intellectual Property), <u>3.10</u> (Tax Matters), and <u>3.14</u> (Brokers) and the representations and warranties of Buyer set forth in <u>Sections 4.1</u> (Organization and Authority), <u>4.2</u> (Authorization and Binding Obligations), <u>4.3</u> (No Contravention; Consents), and <u>4.4</u> (Brokers) (collectively, the "<u>Designated Representations</u>") shall survive until 30 days after the expiration of the applicable statute of limitations (as it may be extended). Notwithstanding the foregoing, any representation or warranty in respect of which

- 19 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

indemnity may be sought under this <u>Section 9</u>, and the indemnity with respect thereto, shall survive the time at which it would otherwise terminate pursuant to this <u>Section 9.1</u> if a written notice relating to the breach thereof giving rise to such right or potential right of indemnity shall have been given in good faith by Buyer or Seller to the party against whom such indemnity may be sought prior to such time; in any such case such representation or warranty shall survive solely as to such claim (and no other claims), until such claim is resolved.   All covenants shall survive the Closing in accordance with their respective terms.

9.2     <u>Indemnity</u>.

    (a)     During the Indemnity Period, Seller shall indemnify and hold harmless Buyer, its affiliates and their respective directors, officers, members, stockholders, employees and representatives (collectively the "<u>Buyer Indemnified Parties</u>") from and against any and all losses, costs and expenses (including reasonable expenses of investigation, and reasonable fees and disbursements of counsel, accountants and other experts) (collectively, "<u>Losses</u>") incurred or suffered by the Buyer Indemnified Parties arising from demands, liabilities, Actions, assessments, damages, fines, Taxes, penalties, (collectively, "<u>Claims</u>") resulting from or relating to:

    (i)     Any breach of any of the representations or warranties made by Seller in this Agreement;

    (ii)     Any failure by Seller to perform any of its covenants or agreements contained in this Agreement;

    (iii)     The Non-Assumed Liabilities; or

    (iv)     Any Creditor Claims.

    (b)     During the Indemnity Period, Buyer shall indemnify and hold harmless Seller, its affiliates and their respective directors, officers, members, stockholders, employees and representatives (collectively the "<u>Seller Indemnified Parties</u>") from and against any and all Losses incurred or suffered by the Seller Indemnified Parties arising from Claims resulting from or relating to:

    (i)     Any breach of any of the representations or warranties made by Buyer in this Agreement;

    (ii)     Any failure by Buyer to perform any of its covenants or agreements contained in this Agreement; or

    (iii)     The Assumed Liabilities.

- 20 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

(c)     No examination, inspection or audit of the assets, properties, financial condition or other matters relating to Seller, the Business or the Assets in connection with this Agreement will in any way limit, affect or impair the ability of Buyer to rely on the representations, warranties, covenants and agreements made by Seller that are contained in this Agreement. Each of the representations and warranties that contains any "Material Adverse Effect," "in all material respects," or other materiality (or correlative meaning) qualification shall be deemed to have been given as though there were no such qualification for purposes of determining the amount of Losses under this Section 9, but not for purposes of determining the accuracy of any representation or warranty.

9.3     Procedures.

(a)     In the event that any Buyer Indemnified Party or a Seller Indemnified Party, as applicable (an "Indemnified Party"), shall sustain or incur any Losses in respect of which indemnification may be sought pursuant to this Section 9, the Indemnified Party seeking indemnification shall assert a claim for indemnification by giving Seller (if the Indemnified Party is a Buyer Indemnified Party) or Buyer (if the Indemnified Party is a Seller Indemnified Party) (the Party receiving such notice, the "Indemnifying Party") prompt written notice thereof (an "Indemnification Notice"), which notice shall describe in reasonable detail the facts and circumstances upon which the asserted claim for indemnification is based, along with a copy of the Claim.  For purposes of this paragraph, any Indemnification Notice that is sent within 15 Business Days of the date upon which the Indemnified Party actually learned of such Loss shall be deemed to have been "prompt notice."  Failure of the Indemnified Party to give the Indemnifying Party prompt notice as provided herein shall not relieve the Indemnifying Party of any of its obligations hereunder except to the extent that the Indemnifying Party is materially prejudiced by such failure.

(b)     Upon the receipt of an Indemnification Notice, the Indemnifying Party shall have the right to undertake (at its own expense) the good faith defense, compromise or settlement of the Claim on behalf of the Indemnified Party by counsel or representatives of its own choosing, if the Indemnifying Party unconditionally agrees in writing that it shall indemnify the Indemnified Party for all Losses relating to the subject Claim.   The Indemnifying Party shall keep the Indemnified Party reasonably informed with respect to such defense.  If the Indemnifying Party elects to undertake such defense, it shall give notice of such election to the Indemnified Party within ten Business Days of its receipt of the Indemnification Notice.  Notwithstanding the foregoing, the Indemnifying Party may not assume or control the defense if the named parties to the Claim (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and representation of both by the same

- 21 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

counsel would be inappropriate (based on a written opinion of outside counsel) due to actual or potential differing interests between them, in which case the Indemnified Party shall have the right to defend the action and to employ counsel reasonably approved by the Indemnifying Party. In such circumstances, the Indemnifying Party shall reimburse the Indemnified Party for all reasonable costs of a single counsel associated with such defense.

(c)     The Indemnified Party shall cooperate with the Indemnifying Party in any defense undertaken by Seller pursuant to <u>Section 9.3(b)</u> and provide the Indemnifying Party with all information and assistance reasonably necessary to permit the Indemnifying Party to pursue such defense. Except as otherwise provided in the last sentence of <u>Section 9.3(a)</u>, the Indemnified Party may retain counsel (at the Indemnified Party's expense) to monitor or participate in such defense, but the Indemnifying Party shall be entitled to control the defense unless the Indemnified Party agrees in writing to relieve the Indemnifying Party from liability with respect to the subject Claim. The Indemnifying Party shall have the right in good faith to settle or compromise any such Claim, if (i) at least ten Business Days prior notice of such settlement or compromise is given to the Indemnified Party and (ii) such settlement or compromise does not require the Indemnified Party to take or refrain from taking any action (*provided* that Indemnified Party shall not unreasonably withhold its consent to the terms of a mutual release with respect to such Claim with the third party making such Claim), contain any admission by or on behalf of the Indemnified Party, or otherwise fail to hold Indemnified Party fully harmless with respect to such Claim. Notwithstanding the foregoing, in connection with any settlement or compromise of a Claim negotiated by the Indemnifying Party, no Indemnified Party shall be required to (i) enter into any settlement that does not include as an unconditional term thereof the delivery to the Indemnified Party of a release from all liability in respect of such Claim, or (ii) enter into any settlement that attributes by its terms any non-indemnified liability to the Indemnified Party.

(d)     The Indemnified Party effects any compromise or settlement of a Claim without the prior written consent of the Indemnifying Party, then the Indemnified Party by so doing forfeits any right to indemnification of Losses with respect to such Claim by the Indemnifying Party under this <u>Section 9</u>. If the Indemnifying Party fails, within ten Business Days after the date of the Indemnification Notice to give notice to the Indemnified Party of the Indemnifying Party's election to assume the defense of the subject Claim, the Indemnified Party shall keep the Indemnifying Party advised on a timely basis of significant developments with respect to such defense and permit the Indemnifying Party to participate, at its own election and expense, at any time, in the defense thereof.

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

9.4     <u>Qualifications and Limitations</u>. Notwithstanding any provision contained in this Agreement to the contrary, Seller's obligations to indemnify the Buyer Indemnified Party pursuant to <u>Section 9.2</u> shall be subject to the following qualifications and limitations:

 (a) Except in respect of any Loss arising out of fraud or intentional misconduct or a breach of a Designated Representation, in no event shall Seller be liable for indemnification pursuant to <u>Section 9.2(a)(i)</u> or Buyer be liable for indemnification pursuant to <u>Section 9.2(b)(i)</u> unless and until the aggregate amount of all such Losses exceeds $25,000 (the "<u>Threshold</u>"), in which event Seller, on the one hand, or Buyer, on the other hand, shall be required to pay or be liable for the entire amount of such Losses regardless of the Threshold.

 (b) Buyer shall not have any right to indemnification under this <u>Section 9</u> in an amount exceeding, in the aggregate, the amount of the Purchase Price.

 (c) If Seller is obligated to indemnify Buyer pursuant to this <u>Section 9</u>, Buyer in its sole discretion may elect, upon written notice to Seller, to cancel Buyer Units held by Seller or its assignees at a value per Buyer Unit determined based upon a valuation of Buyer of $5,000,000 to satisfy such indemnification obligation of Seller.

 (d) Following the Closing Date, except for claims based on fraud and claims for equitable relief, the sole and exclusive remedy of each Party for any Losses arising out of a breach of any representation, warranty, covenant or other agreement herein shall be a claim for indemnification pursuant to this <u>Section 9</u>.

9.5     <u>Tax Characterization of Payments</u>.   Any payment by Buyer or Seller under this <u>Section 9</u> shall, to the extent such payment can be properly so characterized under applicable law, be treated by the parties for all Tax purposes as an adjustment to the Purchase Price.

SECTION 10.
MISCELLANEOUS

10.1    <u>Notices</u>.  All notices, demands, and requests required or permitted to be given under the provisions of this Agreement shall be (a) in writing, may be delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (b) deemed to have been given on the date of actual receipt, which may be conclusively evidenced by the date set forth in the records of any commercial delivery service or on the return receipt, and (c) addressed to the recipient at the address specified on the signature pages hereto, or with respect to any party, to any other address that such party may from time to time designate in a writing delivered in accordance with this <u>Section 10.1</u>.

- 23 -

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

10.2   <u>Expenses</u>.  Except as otherwise provided in this Agreement, Seller and Buyer shall each be liable for its own fees and expenses incurred in connection with the negotiation, preparation, execution or performance of this Agreement and the consummation of the transactions contemplated herein.  All recording costs for instruments of transfer, and all stamp, sales, use and transfer taxes shall be paid by Seller.

10.3   <u>Choice of Law; Dispute Resolution</u>.  THIS AGREEMENT SHALL BE CONSTRUED AND INTERPRETED AND THE RIGHTS OF THE PARTIES DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW OF SUCH STATE.  Any claim, dispute or misunderstanding arising out of or in connection with this Agreement or any of the transactions contemplated hereby, will be submitted to and determined by arbitration before a single arbitrator mutually agreeable to the Parties (or if no arbitrator can be found who is mutually agreeable to the Parties, then the arbitrator will be selected pursuant to the rules and procedures of JAMS for streamlined arbitrations).  The arbitration will be conducted in accordance with the single "JAMS" arbitrator and that such binding arbitration shall be governed by the rules and procedures of JAMS for streamlined arbitrations then in effect, and the arbitrators' award rendered in the matter will be final and conclusive upon the Parties.  The arbitration and all proceedings held in connection therewith will be held in the City of New York, New York at such time and place as is determined by the arbitrator.  Judgment upon the award rendered by the arbitrator may be entered pursuant to applicable arbitration statutes in any court having jurisdiction thereof.  The cost of any filing fees incurred in connection with any such arbitration shall be borne equally by the Parties to the arbitration. No Party to the arbitration may seek, and the arbitrator will not award, punitive, special, consequential or exemplary damages.  Notwithstanding the foregoing, in the event any Party desires to enforce any provision of this Agreement by injunctive relief or specific performance, or to obtain other equitable relief, such party may seek such relief by commencing a proceeding in a state or federal court located in the City of New York, New York, and will not be required to arbitrate such dispute.  EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT.

10.4   <u>Assignment</u>.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller or Buyer without the prior written consent of the other Party.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, and no other person shall have any right, benefit or obligation hereunder.

10.5   <u>Entire Agreement</u>.  This Agreement, all schedules and exhibits, and all documents and certificates to be delivered by the Parties pursuant hereto, collectively represent the entire understanding and agreement between the Parties with respect to the subject matter of this Agreement.  All schedules and exhibits attached to this Agreement shall be deemed part of this Agreement and are incorporated herein, where applicable, as if fully set forth herein.  This Agreement supersedes all prior negotiations, letters of

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

intent or other writings between the Parties and their respective representatives with respect to the subject matter hereof and cannot be amended, supplemented, or modified except by an agreement in writing that makes specific reference to this Agreement or an agreement delivered pursuant hereto, as the case may be, and which is signed by the Party against which enforcement of any such amendment, supplement, or modification is sought.

10.6   <u>Waivers of Compliance; Consents</u>.   Except as otherwise provided in this Agreement, any failure of any of the Parties to comply with any obligation, representation, warranty, covenant, agreement, or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, representation, warranty, covenant, agreement, or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Whenever this Agreement requires or permits consent by or on behalf of any Party, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section.

10.7   <u>Severability</u>.   In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument and this Agreement shall be construed in a manner that, as nearly as possible, reflects the original intent of the Parties.

10.8   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, and all of which counterparts together shall constitute one and the same fully executed instrument.

[END OF PAGE. SIGNATURES FOLLOW.]

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first above written.

MYHEALTHILY INSURANCE SOLUTIONS LLC

By:

Name: *Michael Malhame*

Title: Chief Executive Officer

Address: 25 Rockwood Place, Suite 210
Englewood, NJ 07631

CANDOR USA, INC.

By:

Name: *Matthew Applestein*

Title: director

Address: 52 Maple street
Needham Ma 02492

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

9262/1/8105011.v4

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

## LIST OF EXHIBITS

| | | |
|---|---|---|
| Exhibit A | – | Assignment and Assumption Agreement |
| Exhibit B | – | Bill of Sale |
| Exhibit C | – | Buyer LLC Agreement |

## LIST OF SCHEDULES

| | | |
|---|---|---|
| Schedule 1.1A | – | Assumed Contracts |
| Schedule 1.1B | – | Consents |
| Schedule 1.1C | – | Excluded Assets |
| Schedule 1.1E | – | Permitted Liens |
| Schedule 1.1F | – | Personal Property |
| Schedule 2.3 | – | Assumed Liabilities |
| Schedule 3.6 | – | Intellectual Property |
| Schedule 3.7 | – | Employees |
| Schedule 3.8 | – | Financial Statements |
| Schedule 3.9 | – | Absence of Changes |
| Schedule 3.11 | – | Claims and Litigation |
| Schedule 3.12 | – | Insurance |
| Schedule 3.13 | – | Compliance with Laws |

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

### Schedule 1.1A – Assumed Contracts

- Broker Agreements with:
  - AG Roth Insurance (dated July 22, 2020)
  - Association of America Members (dated March 23, 2020, addendum dated July 22, 2020)
  - [Babcock – NOTE: This appears to be a form agreement and the name of the other entity is not clear – name is illegible]
  - Benefits Consulting Group Inc (dated July 22, 2020)
  - [Brown and Brown – NOTE: This appears to be a form agreement and the name of the other entity is not clear – name is illegible]
  - Cedartown Insurance (dated August 30, 2017)
  - Insurance Marketing Agencies Inc, (dated March 16, 2018, addendum dated July 22, 2020)
  - John Pierre Chaze (dated August 30, 2018) [Note: This is an individual. File is saved as "John Kown External Sales Agent Contract]
  - MJM Global Insurance Brokerage Group (dated October 31, 2019 and November 7, 2019)
  - National Financial Group (dated April 4, 2018)
  - Eastern Benefits (dated May 12, 2020) [NOTE: Do not have signed version of this contract]
  - OCA Benefit Services, LLC (dated July 29, 2020)
- Other Contracts
  - DocuSign, Inc. (dated September 3, 2020)
- License Agreements
  - Office 365
  - Licenses with Amazon Web Services (AWS)
  - UpScope
  - Figma
  - Adobe Cloud
  - GitHub
  - All the open source licenses associated with the third-party source code use in the software

### Schedule 1.1B – Excluded Assets

None, other than office furniture and personal items

### Schedule 1.1E – Permitted Liens

None

### Schedule 1.1F – Personal Property

| Device Name | Motherboard | Model | Serial Number | Processor | Memory |
|---|---|---|---|---|---|
| Candor-Nick Shinman | HP 8544 | HP Laptop 14-cf0xxx | 5CG92952X2 | Intel(R) Pentium(R) CPU 4417U @ 2.30GHz | 3.87 GB |
| BS-Monica Coke | HP 8544 | HP Laptop 14-cf0xxx | 5CG92954JC | Intel(R) Pentium(R) CPU 4417U @ 2.30GHz | 3.87 GB |
| Marketing-Cate Cox | HP 8544 | HP Laptop 14-cf0xxx | 5CG921FLZ | Intel(R) Core(TM) i3-7100U CPU @ 2.40GHz | 3.88 GB |
| Ethan Pruitt | SR Squirtle_SR | Aspire A315-21 | NXGNVAA002723037397600 | AMD A9-9420 RADEON R5, 5 COMPUTE CORES 2C+3G | 11.46 GB |
| Heather | HP 8544 | HP Laptop 14-cf0xxx | 5CG9194D12 | Intel(R) Core(TM) i3-7100U CPU @ 2.40GHz | 3.88 GB |
| BS-Omar Perez | SR Squirtle_SR | Aspire A315-21 | NXGNVAA002723037387600 | AMD A9-9420 RADEON R5, 5 COMPUTE CORES 2C+3G | 5.58 GB |
| Spare | SR Squirtle_SR | Aspire A315-21 | NXGNVAA002723061EF7600 | AMD A9-9420 RADEON R5, 5 COMPUTE CORES 2C+3G | 5.58 GB |
| Philip Kennedy | Dell Inc. 05K5D8 | Vostro 3481 | G4BHBV2 | Intel(R) Core(TM) i3-7020U CPU @ 2.30GHz | 7.9 GB |
| DESKTOP-STOS8TP | SR Squirtle_SR | Aspire A315-21 | NXGNVAA002723061E37600 | AMD A9-9420 RADEON R5, 5 COMPUTE CORES 2C+3G | 5.58 GB |
| CANDOR-JohnDavid | HP 8544 | HP Laptop | 5CG9273S39 | Intel(R) Core(TM) i3-7100U CPU @ 2.40GHz | 3.87 GB |
| PROD-PHAGAN | HP 80FA | HP EliteBook Folio 1040 G3 | 5CD8365YP5 | Intel(R) Core(TM) i5-6300U CPU @ 2.40GHz | 7.88 GB |
| MARK-TOMSMITH | HP 875B | HP ENVY x360 Convertible 15-ed0xxx | CND0280LCZ | Intel(R) Core(TM) i7-1065G7 CPU @ 1.30GHz | 31.79 GB |
| BS-Ektaa Patel | HP 8544 | HP Laptop 14-cf0xxx | 5CG92016L3 | Intel(R) Core(TM) i3-7100U CPU @ 2.40GHz | 3.87 GB |
| BS-Shevie Conner | HP 8544 | HP Laptop 14-cf0xxx | 5CG9312834 | Intel(R) Core(TM) i3-7100U CPU @ 2.40GHz | 3.88 GB |
| Spare-Rename3 | HP 8544 | HP Laptop 14-cf0xxx | 5CG9273S39 | Intel(R) Core(TM) i3-7100U CPU @ 2.40GHz | 3.87 GB |
| Lenovo-Spare | LENOVO Lenovo ideapad 1 | 80UD | MP1B2PY0 | AMD R) Pentium(R) CPU 4405U @ 2.10GHz | 3.64 GB |
| DOO-Kelly Quinn | HP 80FA | HP EliteBook Folio 1040 G3 | 5CD8365YP7 | Intel(R) Core(TM) i5-6300U CPU @ 2.40GHz | 7.88 GB |
| BS-Jeremy McLendon | Dell Inc. 05K5D8 | Vostro 3481 | 2C2NBV2 | Intel(R) Core(TM) i3-7020U CPU @ 2.30GHz | 7.9 GB |
| PROD-Chris Waters | HP 80FA | HP EliteBook Folio 1040 G3 | 5CD8365YPG | Intel(R) Core(TM) i5-6300U CPU @ 2.40GHz | 7.88 GB |

### Schedule 2.3 – Assumed Liabilities

None

4817-4392-3922.2

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

**Schedule 3.6 – Intellectual Property**

- All computer software and all source code, object code, APIs, documentation, databases, technology and all intellectual property rights inherent therein or appurtenant thereto regarding Seller's software for use in connection with: MGA and wholesale brokers; retail brokers; employers and groups; and employees and members.
- Registered Trademarks
  - CANDOR INSURANCE (U.S. Registration No. 5,482,511, registered on May 29, 2018, currently in the name of Candor Insurance Corporation)
- Pending Trademark Applications
  - UNIFIED BENEFIT ECOSYSTEM (U.S. Application Serial No. 88852176, filed on March 30, 2020, currently in the name of Candor Insurance Corporation)
  - HIBERNATE AND RECOVER (U.S. Application Serial No. 88858958, filed on April 3, 2020, currently in the name of Candor Insurance Corporation)
  - HIBERNATE AND RECOVER FOR BUSINESS, (U.S. Application Serial No. 88859021, filed on April 3, 2020, currently in the name of Candor Insurance Corporation)
- Common Law Trademarks
  - CANDOR, TRUE COST OF CARE, TRUE COST OF HEALTH CARE, UNIFIED BENEFIT ECOSYSTEM, HIBERNATE AND RECOVER, HIBERNATE AND RECOVER FOR BUSINESS, CANDOR HIX-CENTRAL LEDGER;  INTELLEGENT HEALTH COVERAGE, DIGITAL ENHANCED AGENCY; HIX BLOCK CHAIN PLUS ANALYTICS; PROGRESSIVE LIFE QUESTIONS; PREDICTIVE MODELING; CANDOR BMO; CANDOR DIGITAL BRIEFCASE; CANDOR CROSS SELL PORTAL; HIX BLOCK CHAIN PLUS ANALYTICS; CANDOR PROVIDER INTERNAL ANALYTICS; CANDOR HIX ANALYTICS; and the Flower Design used next to the CANDOR trademark on the candor.insurance website
- Domain Names and all associated Websites
  - affaoa.com
  - aofamembership.com
  - associationforcandor.com
  - associationscandor.com
  - broker-united.com
  - brokerdealer.us
  - brokernow.info
  - brokertoday.us
  - brokerunited.today
  - brokerunitedus.com
  - businesscandor.com
  - businesscandor.info
  - candorinsurance.com
  - candor.insurance
  - candor-associations.today
  - candor-associations.us
  - candor-broker.com
  - candor-usa.com
  - candor-usa.net
  - candor4associations.com
  - candor4brokers.com
  - candor4everyone.com
  - candorandbrokers.us
  - candorassociation.com
  - candorassociation.today
  - candorassociation.us
  - candorassociations.today
  - candoratassociations.com
  - candorbroker.info
  - candorbroker.today

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

- candorbrokernetwork.com
- candorbrokers.com
- candorforall.com
- candorforall.info
- candorforassoc.com
- candorforassoc.info
- candorforassociation.info
- candorforassociations.com
- candorforassociations.today
- candorforbroker.com
- candorforbrokers.com
- candorforbrokers.today
- candorforbrokers.us
- candorforeveryone.today
- candorforeveryone.us
- candorforsmallbiz.com
- candorforsmallbusiness.info
- candorforsmallbusiness.today
- candorforsmallbusinesses.com
- candorforsmallbusinesses.today
- candorforsmallbusinesses.us
- candorsmallbusiness.com
- candortoeveryone.com
- candorus.com
- candorus.net
- conaoa.com
- everyonegetscandor.today
- firaoa.com
- gethealthmatters.com
- giggicare.com
- hibernateandrecover.biz
- hibernateandrecover.business
- hibernateandrecover.care
- hibernateandrecover.com
- hibernateandrecover.net
- hibernateandrecover.org
- ispyhealth.com
- lifestylemedical.us
- manaoa.com
- minaoa.com
- mrbroker.info
- mybrokergroup.com
- myprosperbenefits.com
- peokiller.com
- pubaoa.com
- rtaoa.com
- seraoa.com
- smallbizcandor.com
- smallbusinesscandor.com
- smallbusinesscandor.info
- thebrokerunited.com
- thecandorassociations.com
- thecandorassociations.us
- thecandorbroker.com
- thecandorforall.com
- thecandorforbrokers.us

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

- o   thecandorforeveryone.com
- o   thecandorforeveryone.info
- o   thecandorforeveryone.us
- o   thesmallbusinesscandor.com
- o   wtaoa.com
- o   yourbusinesscandor.com

All passwords and account information for the foregoing Domain Names and associated Websites

## Schedule 3.7 Employees

- • Employees

| Employee Name | Job Title | Hire Date | Employee Status | Annualized Pay Rate |
|---|---|---|---|---|
| Bagabas, Ayman | Full Stack Developer | 09/16/2019 | Active | $56,799.84 |
| Black, Kathleen | Intern | 09/23/2020 | Active | $15,600.00 |
| Conner, Shevie | Broker Account Manager | 09/23/2019 | Active | $49,999.92 |
| Cox, Catherine | Marketing Manager | 06/01/2019 | Active | $61,000.08 |
| Feagin, Heather | Product Coordinator | 09/01/2019 | Active | $48,999.84 |
| Garletts, John David | Sales Manager | 08/17/2020 | Active | $75,000.00 |
| Heider, Jacob | Director of Engineering | 11/25/2019 | Active | $85,000.08 |
| Howell, Maxim | Chief Product Officer | 03/16/2019 | Active | $165,000.00 |
| Kadkol, Kruti | Intern | 06/15/2020 | Active | $15,600.00 |
| Kennedy, Philip | Trusted Advisor | 09/21/2020 | Active | $49,999.92 |
| McLendon, Jeremy D | Vice President | 02/16/2018 | Active | $88,000.08 |
| Nelson, Pamela | Accounting/Payroll | 04/01/2020 | Active | $52,000.08 |
| Newton, Reedy | Intern | 03/30/2020 | Active | $15,600.00 |
| Patel, Jimilkumar | Intern | 07/16/2020 | Active | 15,600.00 |
| Pruitt, Ethan | Mgr. of Expediting | 06/22/2020 | Active | $48,000.00 |
| Quinn, Kelly | Contact Center Mgr. | 04/29/2019 | Active | $66,000.00 |
| Shirman, Nicholas | Director of Sales | 05/16/2020 | Active | $79,999.92 |
| Smith, Thomas | Principal Graphics Designer | 04/18/2019 | Active | $72,499.92 |
| Tomlin, Ted | Trusted Advisor | 09/03/2020 | Active | $49,999.92 |
| Tsuyuki, Christina | Director of Service Design | 07/20/2020 | Active | $72,499.92 |
| Waters, Christopher | Project Manager | 06/27/2019 | Active | $64,000.08 |

[NOTE:  We do not know if there are any bonus arrangements]

- • Contractors
  - o   Pamela Nelson is currently engaged as an accounting contractor, but this arrangement will not continue post-transaction.

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

- 2019 Balance Sheet

| | Jan 2019 | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | Nov 2019 | Dec 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | | | |
| **Bank Accounts** | | | | | | | | | | | | |
| 100 Synovus Operating | 3,395.71 | -373.09 | 9,586.10 | 59,274.13 | 205,965.52 | 97,670.89 | 10,635.15 | 1,506.58 | 18,096.96 | -309.59 | 33,127.68 | -12,257.70 |
| 102 Premium Trust Account | 28,960.33 | 18,202.94 | 28,056.63 | 19,070.56 | 32,146.64 | 34,368.65 | 56,058.90 | 33,073.10 | 46,425.94 | 25,727.92 | 30,283.07 | 21,164.95 |
| 104 Charge Account | 0.00 | 0.00 | 0.00 | 660.85 | 372.37 | -343.85 | -374.88 | -246.42 | -922.90 | -806.26 | 3,902.65 | 586.88 |
| **Total Bank Accounts** | $ 32,376.03 | $ 17,829.95 | $ 37,694.73 | $ 78,914.95 | $ 239,484.53 | $ 131,715.99 | $ 68,319.17 | $ 34,431.26 | $ 63,600.90 | $ 24,611.95 | $ 67,281.40 | $ 9,494.13 |
| **Accounts Receivable** | | | | | | | | | | | | |
| 110 Accounts Receivable (A/R) to be verified | 0.00 | 0.00 | 60,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Accounts Receivable** | $ 0.00 | $ 0.00 | $ 60,000.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Other Current Assets** | | | | | | | | | | | | |
| 120 Security Deposits | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 126 Uncategorized Asset | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -5,186.56 | 0.00 |
| Prepaid Assets | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 |
| **Total Other Current Assets** | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 2,179.44 | $ 7,366.00 |
| **Total Current Assets** | $ 39,642.03 | $ 25,195.95 | $ 105,060.73 | $ 86,180.56 | $ 246,850.53 | $ 139,081.99 | $ 73,685.17 | $ 41,797.26 | $ 70,966.90 | $ 31,977.95 | $ 69,472.14 | $ 16,860.13 |
| **Fixed Assets** | | | | | | | | | | | | |
| 130 Developed Software | 346,762.95 | 346,762.95 | 346,762.95 | 346,762.95 | 346,762.95 | 346,762.95 | 346,762.95 | 346,762.95 | 346,762.95 | 346,762.95 | 346,762.95 | 346,762.95 |
| 131 Accumulated Amortization of Developed Software | -71,296.00 | -71,296.00 | -71,296.00 | -71,296.00 | -71,296.00 | -71,296.00 | -71,296.00 | -71,296.00 | -71,296.00 | -71,296.00 | -71,296.00 | -182,046.00 |
| 134 Fixed Asset Equipment | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 |
| 136 Furniture & Fixtures | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 665,253.29 | 18,253.25 |
| 140 Intangible Assets | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 145 Intellectual Property | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 398,641.00 |
| Accumulated Depreciation | -10,125.00 | -10,125.00 | -10,125.00 | -10,125.00 | -10,125.00 | -10,125.00 | -10,125.00 | -10,125.00 | -10,125.00 | -10,125.00 | -10,125.00 | -18,067.00 |
| **Total Fixed Assets** | $ 305,054.20 | $ 305,054.20 | $ 305,054.20 | $ 305,054.20 | $ 305,054.20 | $ 305,054.20 | $ 305,054.20 | $ 305,054.20 | $ 305,054.20 | $ 305,054.20 | $ 305,054.20 | $ 683,003.30 |
| **Other Assets** | | | | | | | | | | | | |
| 150 Investment in Lifestyle Medical | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 155 Investment in Tenex | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Other Assets** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| **TOTAL ASSETS** | $ 344,696.23 | $ 330,250.05 | $ 410,104.93 | $ 391,234.76 | $ 550,904.73 | $ 444,136.09 | $ 378,739.37 | $ 346,851.46 | $ 376,020.30 | $ 337,032.15 | $ 374,527.04 | $ 699,863.33 |
| **LIABILITIES AND EQUITY** | | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | | | |
| **Accounts Payable** | | | | | | | | | | | | |
| 200 Accounts Payable (A/P) To be verified | 142,037.85 | 159,443.77 | 148,946.24 | 140,295.67 | 143,528.44 | 135,013.08 | 150,435.37 | 278,105.21 | 206,886.86 | 224,101.11 | 148,419.80 | 157,927.80 |
| **Total Accounts Payable** | $ 142,037.85 | $ 159,443.77 | $ 148,946.24 | $ 140,295.67 | $ 143,528.44 | $ 135,013.08 | $ 150,435.37 | $ 278,105.21 | $ 206,886.86 | $ 224,101.11 | $ 148,419.80 | $ 157,927.80 |
| **Other Current Liabilities** | | | | | | | | | | | | |
| 206 Accrued Payroll Taxes | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 207 Garnishment | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -263.50 | -289.50 | 285.71 |
| 210 Accrued Wages Payable (to be reviewed) | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 |
| 216 Due for Lifestyle Medical Purchase | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 220 Due for Tenex Purchase | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 233 Loan from John Weber | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 234 Loan from Scott Lesmes | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| 235 Loan Payable (Bal to be reviewed) | 49,154.59 | 44,342.33 | 99,525.07 | 89,890.55 | 402,847.40 | 368,212.08 | 420,144.52 | 407,500.52 | 637,425.32 | 670,707.30 | 635,903.95 | 366,876.06 |
| **Total Other Current Liabilities** | $ 78,550.43 | $ 73,738.17 | $ 128,920.91 | $ 119,286.39 | $ 432,243.24 | $ 397,608.72 | $ 449,540.36 | $ 437,196.36 | $ 668,936.64 | $ 698,936.64 | $ 665,070.19 | $ 396,626.41 |
| **Total Current Liabilities** | $ 220,628.28 | $ 233,181.94 | $ 277,867.15 | $ 259,582.06 | $ 575,771.68 | $ 532,621.80 | $ 599,976.73 | $ 715,301.57 | $ 875,708.02 | $ 923,940.75 | $ 813,495.98 | $ 554,495.21 |
| **Long-Term Liabilities** | | | | | | | | | | | | |
| 230 Long-term Stock Issuance Payable | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 656,000.00 |
| 232 Deferred Salary/Compensation - JRS (to be verified) | 348,000.00 | 348,000.00 | 348,000.00 | 348,000.00 | 348,000.00 | 348,000.00 | 348,000.00 | 348,000.00 | 348,000.00 | 348,000.00 | 328,000.00 | 656,000.00 |
| **Total Long-Term Liabilities** | $ 348,000.00 | $ 348,000.00 | $ 348,000.00 | $ 348,000.00 | $ 348,000.00 | $ 348,000.00 | $ 348,000.00 | $ 348,000.00 | $ 348,000.00 | $ 348,000.00 | $ 328,000.00 | $ 656,000.00 |
| **Total Liabilities** | $ 568,628.28 | $ 581,181.94 | $ 625,867.16 | $ 607,582.06 | $ 923,771.68 | $ 880,621.80 | $ 947,976.73 | $ 1,063,301.57 | $ 1,221,700.02 | $ 1,271,940.76 | $ 1,141,499.98 | $ 1,210,466.21 |
| **Equity** | | | | | | | | | | | | |
| 296 Opening Balance Equity | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 300 Owner's Investment (Bal to be reviewed) | 1,760,324.68 | 1,760,324.68 | 1,785,324.68 | 1,904,324.68 | 1,904,324.68 | 1,904,324.68 | 1,976,300.68 | 2,026,300.68 | 2,076,300.68 | 2,176,300.68 | 2,388,076.06 | 2,388,076.06 |
| 305 Retained Earnings | -1,632,649.90 | -1,632,649.90 | -1,632,849.90 | -1,632,649.90 | -1,632,649.90 | -1,632,649.90 | -1,632,649.90 | -1,632,649.90 | -1,632,649.90 | -1,632,649.90 | -1,632,649.90 | -2,041,931.90 |
| 310 Stock | 304.76 | 304.76 | 304.76 | 304.76 | 304.76 | 304.76 | 304.76 | 304.76 | 304.76 | 304.76 | 304.76 | 390.76 |
| Net Income | -351,911.59 | -378,911.43 | -368,741.76 | -488,326.85 | -644,846.49 | -708,465.25 | -841,215.90 | -1,060,455.63 | -1,289,723.34 | -1,378,944.12 | -1,310,996.47 | -1,457,138.40 |
| **Total Equity** | $ -223,932.05 | $ -250,931.89 | $ -215,762.22 | $ -216,347.31 | $ -372,866.95 | $ -436,485.71 | $ -569,256.36 | $ -716,450.11 | $ -845,767.90 | $ -934,908.60 | $ -766,982.95 | $ -1,110,602.88 |
| **TOTAL LIABILITIES AND EQUITY** | $ 344,696.23 | $ 330,250.05 | $ 410,104.93 | $ 391,234.76 | $ 550,904.73 | $ 444,136.09 | $ 378,739.37 | $ 346,851.46 | $ 376,020.30 | $ 337,032.15 | $ 374,527.04 | $ 699,863.33 |

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

- 2020 Balance Sheet

| | Jan 2020 | Feb 2020 | Mar 2020 | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| **Current Assets** | | | | | | | | | |
| **Bank Accounts** | | | | | | | | | |
| 100 Synovus Operating | 2,593.91 | 9,951.38 | -68,374.14 | 343,701.80 | 284,290.02 | 53,188.96 | 28,631.38 | 12,256.64 | 12,787.33 |
| 102 Premium Trust Account | 23,920.44 | 3,490.75 | 54,648.55 | 112,543.49 | 94,008.40 | 138,174.99 | 142,648.50 | 106,554.14 | 116,188.99 |
| 104 Charge Account | -1,023.07 | 822.08 | 322.98 | 1,955.74 | 6,263.03 | 4,151.33 | 36.48 | 245.66 | 1,961.62 |
| 105 Other Premium -RNS | | 0.00 | 1,000.00 | 923.62 | 618.42 | 313.22 | 48.02 | 1,708.56 | 2,318.64 |
| **Total Bank Accounts** | $ 25,491.28 | $ 14,264.21 | -$ 12,402.61 | $ 459,124.65 | $ 385,179.87 | $ 195,828.50 | $ 171,364.38 | $ 120,765.00 | $ 133,256.58 |
| **Accounts Receivable** | | | | | | | | | |
| 110 Accounts Receivable (A/R) to be verified | 14,960.00 | 169,905.00 | 209,400.00 | 139,795.00 | 185,890.00 | 271,585.00 | 454,785.50 | 493,375.00 | 645,270.00 |
| **Total Accounts Receivable** | $ 14,960.00 | $ 169,905.00 | $ 209,400.00 | $ 139,795.00 | $ 185,890.00 | $ 271,585.00 | $ 454,785.50 | $ 493,375.00 | $ 645,270.00 |
| **Other Current Assets** | | | | | | | | | |
| 120 Security Deposits | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 125 Uncategorized Asset | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Prepaid Assets | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 | 7,366.00 |
| **Total Other Current Assets** | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 | $ 7,366.00 |
| **Total Current Assets** | $ 47,817.28 | $ 191,535.21 | $ 204,363.39 | $ 606,285.65 | $ 588,435.87 | $ 474,779.50 | $ 633,515.88 | $ 621,506.00 | $ 785,892.58 |
| **Fixed Assets** | | | | | | | | | |
| 130 Developed Software | 347,882.95 | 347,911.01 | 347,911.01 | 347,911.01 | 347,911.01 | 347,911.01 | 347,911.01 | 347,911.01 | 347,911.01 |
| 131 Accumulated Amortization of Developed Software | -182,046.00 | -182,046.00 | -182,046.00 | -182,046.00 | -182,046.00 | -182,046.00 | -182,046.00 | -182,046.00 | -182,046.00 |
| 134 Fixed Asset Equipment | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 21,459.00 | 24,783.49 | 24,783.49 | 24,783.49 | 24,783.49 |
| 135 Furniture & Fixtures | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 | 18,253.25 |
| 140 Intangible Assets | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 145 Intellectual Property | 396,641.00 | 396,641.00 | 396,641.00 | 396,641.00 | 396,641.00 | 396,641.00 | 396,641.00 | 396,641.00 | 396,641.00 |
| Accumulated Depreciation | -18,067.00 | -18,067.00 | -18,067.00 | -18,067.00 | -18,067.00 | -18,067.00 | -18,067.00 | -18,067.00 | -18,067.00 |
| **Total Fixed Assets** | $ 584,123.20 | $ 584,151.26 | $ 584,151.26 | $ 584,151.26 | $ 584,151.26 | $ 587,475.75 | $ 587,475.75 | $ 587,475.75 | $ 587,475.75 |
| **Other Assets** | | | | | | | | | |
| 150 Investment in Lifestyle Medical | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 155 Investment in Tenex | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Other Assets** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| **TOTAL ASSETS** | $ 631,940.48 | $ 775,686.47 | $ 788,514.65 | $1,190,436.91 | $1,172,587.13 | $1,062,255.25 | $1,220,991.63 | $1,208,981.75 | $1,373,368.33 |
| **LIABILITIES AND EQUITY** | | | | | | | | | |
| **Liabilities** | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | |
| **Accounts Payable** | | | | | | | | | |
| 200 Accounts Payable (A/P) To be verified | 185,149.24 | 108,220.96 | 126,348.18 | 127,107.03 | 139,213.59 | 116,319.14 | 118,657.96 | 147,363.02 | 158,022.93 |
| **Total Accounts Payable** | $ 185,149.24 | $ 108,220.96 | $ 126,348.18 | $ 127,107.03 | $ 139,213.59 | $ 116,319.14 | $ 118,657.96 | $ 147,363.02 | $ 158,022.93 |
| **Other Current Liabilities** | | | | | | | | | |
| 205 Accrued Payroll Taxes | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 207 Garnishment | 268.67 | 133.96 | 401.88 | 0.00 | 133.96 | 267.92 | 133.96 | 0.00 | 638.96 |
| 210 Accrued Wages Payable (to be reviewed) | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 | 4,395.84 |
| 215 Due for Lifestyle Medical Purchase | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 220 Due for Tenex Purchase | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 233 Loan from John Weber | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 234 Loan from Scott Lesmes | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| 235 Loan Payable (Bal to be reviewed) | 366,190.71 | 54,470.29 | 33,337.28 | 34,989.52 | 34,989.52 | 34,989.52 | 34,989.52 | 34,989.52 | 34,989.52 |
| **Total Other Current Liabilities** | $ 395,855.22 | $ 84,000.09 | $ 63,135.00 | $ 64,385.36 | $ 64,519.32 | $ 64,653.28 | $ 64,519.32 | $ 64,385.36 | $ 65,024.32 |
| **Total Current Liabilities** | $ 581,004.46 | $ 192,221.07 | $ 189,483.18 | $ 191,492.39 | $ 203,732.91 | $ 180,972.42 | $ 183,177.28 | $ 211,748.38 | $ 223,047.25 |
| **Long-Term Liabilities** | | | | | | | | | |
| 230 Long-term Stock Issuance Payable | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 232 Deferred Salary/Compensation - JRS (to be verified) | 656,000.00 | 626,000.00 | 626,000.00 | 626,000.00 | 626,000.00 | 626,000.00 | 626,000.00 | 626,000.00 | 461,000.00 |
| Notes Payable Anketell | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| Notes Payable Blue Toque/T. Crick | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 110,000.00 |
| Notes Payable Lusk | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| Notes Payable Prokes | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| PPP Loan - Synovus | | 0.00 | 0.00 | 572,827.50 | 572,827.50 | 572,827.50 | 572,827.50 | 572,827.50 | 572,827.50 |
| SBA EIDL | | 0.00 | 0.00 | 0.00 | 150,000.00 | 150,000.00 | 150,000.00 | 150,000.00 | 150,000.00 |
| **Total Long-Term Liabilities** | $ 656,000.00 | $ 626,000.00 | $ 626,000.00 | $1,198,827.50 | $1,348,827.50 | $1,348,827.50 | $1,523,827.50 | $1,523,827.50 | $1,468,827.50 |
| **Total Liabilities** | $1,237,004.48 | $ 818,221.07 | $ 815,483.18 | $1,390,319.89 | $1,552,560.41 | $1,529,799.92 | $1,707,004.78 | $1,735,575.88 | $1,691,874.75 |
| **Equity** | | | | | | | | | |
| 295 Opening Balance Equity | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 300 Owner's Investment (Bal to be reviewed) | 2,888,076.86 | 3,426,076.60 | 3,456,076.60 | 3,391,076.60 | 3,391,076.60 | 3,391,076.60 | 3,391,076.60 | 3,391,076.60 | 3,556,076.60 |
| 305 Retained Earnings | -3,499,070.30 | -3,499,070.30 | -3,499,070.30 | -3,499,070.30 | -3,499,070.30 | -3,499,070.30 | -3,499,070.30 | -3,499,070.30 | -3,499,070.30 |
| 310 Stock | 390.76 | 390.76 | 390.76 | 390.76 | 390.76 | 390.76 | 390.76 | 390.76 | 390.76 |
| ESPP | | 1,184.00 | 2,368.00 | 3,330.00 | 4,218.00 | 5,106.00 | 5,994.00 | 6,438.00 | 6,882.00 |
| Net Income | 5,538.90 | 28,884.34 | 13,266.41 | -95,610.04 | -276,588.34 | -365,047.73 | -384,404.21 | -425,429.19 | -382,785.48 |
| **Total Equity** | -$ 605,063.98 | -$ 42,534.60 | -$ 26,968.53 | -$ 199,882.98 | -$ 379,973.28 | -$ 467,544.67 | -$ 486,013.15 | -$ 526,594.13 | -$ 318,506.42 |
| **TOTAL LIABILITIES AND EQUITY** | $ 631,940.48 | $ 775,686.47 | $ 788,514.65 | $1,190,436.91 | $1,172,587.13 | $1,062,255.25 | $1,220,991.63 | $1,208,981.75 | $1,373,368.33 |

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

- ## 2019 Income Statement

| | Jan 2019 | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | Nov 2019 | Dec 2019 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | |
| 400 Carrier SaaS Fees | 1,895.19 | 2,895.24 | 2,428.37 | 1,878.90 | 2,626.78 | 2,879.46 | 1,689.66 | 12,776.46 | 2,862.53 | 4,335.19 | 2,407.86 | 2,060.42 | 40,736.06 |
| 404 SaaS Development Fees | | | | | | | | | -9.99 | -83.63 | 383,865.35 | -215,771.73 | 168,000.00 |
| 405 SaaS Brokerage Fees | | | 60,000.00 | 322.15 | | 108,000.00 | | | | | | 407,677.85 | 576,000.00 |
| 460 Premium | 52,728.58 | 34,281.11 | 53,847.01 | 30,081.86 | 50,663.97 | 25,495.85 | 46,192.36 | 23,666.79 | 36,176.64 | 41,862.22 | 65,219.10 | 81,615.60 | 542,031.31 |
| **Total Income** | $ 54,623.77 | $37,176.35 | $116,275.38 | $ 32,282.91 | $ 53,290.75 | $136,375.31 | $ 47,882.04 | $ 36,443.27 | $ 39,029.18 | $ 46,113.78 | $451,492.31 | $ 276,782.34 | $ 1,326,767.39 |
| **Gross Profit** | $ 54,623.77 | $37,176.35 | $116,275.38 | $ 32,282.91 | $ 53,290.75 | $136,375.31 | $ 47,882.04 | $ 36,443.27 | $ 39,029.18 | $ 46,113.78 | $451,492.31 | $ 276,782.34 | $ 1,326,767.39 |
| **Expenses** | | | | | | | | | | | | | |
| 500 Advertising & Marketing | 300.00 | | 8,004.00 | 8,486.09 | 11,260.73 | 297.60 | | 1,337.26 | 727.86 | 22.14 | 22.00 | -50.00 | 30,407.68 |
| 503 Meetings/Conventions | | | | | | | | 76,410.88 | -14,114.30 | 2,325.00 | 4,400.19 | 324.29 | 69,346.06 |
| **Total 500 Advertising & Marketing** | $ 300.00 | $ 0.00 | $ 8,004.00 | $ 8,486.09 | $ 11,260.73 | $ 297.60 | $ 0.00 | $ 77,748.14 | -$ 13,386.44 | $ 2,347.14 | $ 4,422.19 | $ 274.29 | $ 99,753.74 |
| 506 Bank Charges & Fees | 86.00 | 313.00 | 419.48 | 151.00 | 333.56 | 190.00 | 280.00 | 532.76 | 480.00 | 490.00 | 171.09 | 169.36 | 3,616.27 |
| 512 Computer Expense | | | | | 49.94 | | 3,505.01 | | | -37.44 | 9,798.19 | | 13,311.70 |
| 513 Consulting | 7,500.00 | | 2,000.00 | | | 1,400.00 | | | | | | | 10,900.00 |
| 514 Contractors | | | 6,000.00 | 4,670.67 | 8,706.90 | 6,025.24 | 14,407.28 | 11,025.04 | 3,960.00 | 1,000.00 | 8,415.00 | 5,720.00 | 69,930.13 |
| 515 Digital Management | | | | | | | | | 1,550.00 | | | | 1,550.00 |
| 520 Dues & subscriptions | 4,625.58 | 3,968.75 | 4,988.75 | 11,906.25 | 20,921.24 | 12,100.23 | 11,906.25 | 11,906.25 | 12,406.25 | 11,906.25 | | | 106,615.80 |
| 525 Employer Taxes--General | | | 1,373.63 | 2,741.97 | 1,619.99 | 3,367.30 | 3,339.45 | 1,465.98 | 6,009.94 | 2,935.49 | 11,089.21 | 7,401.26 | 41,364.32 |
| 530 Employer Taxes--Software Development | | | 369.34 | 1,682.89 | 3,347.40 | 3,277.84 | 3,152.52 | 1,581.30 | 4,824.45 | 1,715.72 | 5,798.08 | -25,749.48 | 0.06 |
| 540 Insurance | 63.00 | 63.00 | 63.00 | 212.00 | 63.00 | 863.43 | 63.00 | 4,826.24 | 5,154.84 | 3,018.06 | 1,995.00 | | 16,384.57 |
| 541 Insurance Premium Paid | 46,031.60 | 44,622.22 | 44,375.21 | 40,046.78 | 50,830.12 | 24,506.05 | 25,187.62 | 41,291.41 | 23,323.80 | 60,952.57 | 72,618.41 | 78,809.98 | 552,597.77 |
| 543 Interest Paid | | | | | | | | | | | | 55,278.14 | 55,278.14 |
| 545 IT Services | 4,950.39 | 11,562.17 | 6,601.78 | | 8,501.78 | 7,764.00 | 12,191.70 | 8,543.00 | 8,933.23 | 12,308.00 | 8,543.00 | 21,689.00 | 109,718.05 |
| 550 Legal & Professional Services (deleted) | 39.99 | | 79.98 | 700.70 | 39.99 | | 79.98 | | 9,920.13 | | 79.98 | 39.99 | 10,960.74 |
| 551 Meals & Entertainment | | | | 14.40 | 584.75 | 10,896.63 | 2,612.58 | 900.00 | 5,989.14 | 3,256.46 | 6,876.82 | 3,552.01 | 34,685.01 |
| 552 Membership | | | | | | | | | | 110.00 | | | 110.00 |
| 553 Legal & Professional Fees | 2,387.00 | 787.00 | 787.00 | 787.00 | 787.00 | 787.00 | 787.00 | 1,746.00 | 0.00 | | | | 8,657.00 |
| 554 Professional Fees | 320.20 | 1,070.20 | 3,459.97 | 1,520.20 | 770.20 | 245.20 | 1,250.10 | 800.29 | 369.50 | 1,370.19 | 316.20 | 69.00 | 11,560.34 |
| 555 Office Equipment | | | | | -855.99 | | | | | | | | -855.99 |
| 556 Office Supplies & Software | | | | 4,322.34 | 750.80 | 781.00 | 559.90 | 11,376.15 | | 515.00 | 1,500.00 | 1,778.31 | 21,385.09 |
| 560 Office/General Administrative Expenses | 989.73 | 206.16 | 1,472.55 | 963.46 | 1,770.48 | 976.99 | 2,174.69 | 1,835.13 | 1,527.35 | 2,081.07 | 5,015.95 | 4,860.20 | 23,873.76 |
| 565 Parking | | | | | 264.01 | 140.00 | | 136.05 | | | 4.00 | | 544.06 |
| 570 Postage | 44.99 | | | 15.49 | | | | 17.85 | | | 18.17 | | 96.50 |
| 572 Processing Fee | | | | 22.00 | 86.00 | | 143.46 | 2,430.00 | | | 299.95 | | 2,983.41 |
| 580 Reimbursable Expenses | | | | 1,906.56 | 554.04 | 3,163.62 | 6,327.96 | | 1,201.54 | 7,138.00 | 24,968.60 | 607.13 | 45,867.55 |
| 585 Rent & Lease | 2,495.00 | | 2,000.00 | 5,566.00 | 4,910.51 | 6,096.43 | 8,009.90 | 25,925.24 | -2,400.00 | 9,249.60 | 28,885.40 | 9,302.20 | 100,100.48 |
| 590 Salaries & Wages - General | | | 13,476.13 | 29,987.33 | 23,320.15 | 34,956.78 | 35,442.19 | 78,778.32 | 33,414.99 | 107,209.88 | 70,439.14 | | 446,225.13 |
| 600 Salaries & Wages - Software Development | 348,000.00 | | 3,557.75 | 15,592.30 | 37,929.67 | 39,848.38 | 43,750.00 | 22,711.00 | 63,677.32 | 20,691.66 | 69,722.50 | 33,316.94 | 695,999.52 |
| 610 Taxes & Licenses | 116.18 | -94.90 | 172.36 | 299.90 | | | | -147.02 | 81.18 | | 81.18 | | 508.88 |
| 615 Transportation | | | | | | | 350.00 | | 508.88 | | | | 858.88 |
| 620 Travel | 575.00 | 1,878.59 | 8,040.33 | 18,689.42 | 33,347.32 | 40,919.25 | 8,694.45 | 11,096.97 | | 11,819.00 | 2,677.78 | 847.99 | 138,386.10 |
| 625 Utilities | 499.90 | | | | | | | | | | | | 499.90 |
| Employee Benefits | -12,499.20 | | -1,314.75 | 1,883.15 | 1,478.90 | 1,478.90 | -782.44 | -1,504.02 | 5,884.55 | -1,132.15 | 13,159.26 | 34,258.61 | 41,113.90 |
| Other Business Expenses | | | | | | | | | | | | 393.00 | 393.00 |
| **Total Expenses** | $ 406,535.36 | $ 64,176.19 | $106,100.71 | $ 151,868.00 | $ 209,810.39 | $199,994.07 | $ 180,632.69 | $ 255,713.00 | $ 218,266.89 | $ 185,534.56 | $383,548.66 | $ 303,230.37 | $ 2,665,213.79 |
| **Net Operating Income** | -$351,911.59 | -$26,999.84 | $ 10,168.67 | -$119,585.09 | -$156,519.64 | -$ 63,618.76 | -$132,760.65 | -$219,269.73 | -$179,237.71 | -$139,220.78 | $ 67,945.65 | -$ 27,447.93 | -$1,338,446.40 |
| **Other Expenses** | | | | | | | | | | | | | |
| Amortization expense | | | | | | | | | | | 110,750.00 | | 110,750.00 |
| Depreciation expense | | | | | | | | | | | 7,942.00 | | 7,942.00 |
| **Total Other Expenses** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $118,692.00 | $ 0.00 | $ 118,692.00 |
| **Net Other Income** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | -$118,692.00 | $ 0.00 | -$ 118,692.00 |
| **Net Income** | -$351,911.59 | -$26,999.84 | $ 10,168.67 | -$119,585.09 | -$156,519.64 | -$ 63,618.76 | -$132,760.65 | -$219,269.73 | -$179,237.71 | -$139,220.78 | -$146,139.83 | -$1,467,138.40 |

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

- 2020 Income Statement

| | Jan 2020 | Feb 2020 | Mar 2020 | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | |
| 400 Carrier SaaS Fees | 1,946.38 | 2,220.81 | 2,032.33 | 2,630.76 | 1,283.33 | 715.42 | 682.77 | 666.04 | 42.64 | 12,220.48 |
| 404 SaaS Development Fees | 191,719.42 | 192,000.00 | -383,719.42 | | | | | | | 0.00 |
| 405 SaaS Brokerage Fees | 14,960.00 | 56,945.00 | 521,747.88 | 39,395.00 | 56,095.00 | 75,695.00 | 183,200.50 | 123,595.00 | 151,895.00 | 1,223,528.38 |
| 450 Premium | 202,451.36 | 183,705.50 | 233,524.35 | 305,029.82 | 219,605.48 | 275,019.62 | 275,106.63 | 214,266.51 | 150,813.52 | 2,059,522.79 |
| 451 RightNowSolutions | | | | 268.82 | | | | | 905.28 | 1,174.10 |
| Total 450 Premium | $202,451.36 | $183,705.50 | $233,524.35 | $305,298.64 | $219,605.48 | $275,019.62 | $275,106.63 | $214,266.51 | $151,718.80 | $2,060,696.89 |
| Misc Income | | | | 10,000.00 | | | | | | 10,000.00 |
| Total Income | $411,077.16 | $434,871.31 | $373,585.14 | $357,324.40 | $276,983.81 | $351,430.04 | $458,989.90 | $338,527.55 | $303,656.44 | $3,306,445.75 |
| Gross Profit | $411,077.16 | $434,871.31 | $373,585.14 | $357,324.40 | $276,983.81 | $351,430.04 | $458,989.90 | $338,527.55 | $303,656.44 | $3,306,445.75 |
| **Expenses** | | | | | | | | | | |
| 500 Advertising & Marketing | | 51.36 | | 349.52 | 719.83 | 548.83 | 1,019.00 | 619.00 | 619.00 | 3,926.54 |
| 501 Trade Shows | 921.00 | 2,386.80 | 3,532.99 | | | | | | | 6,840.79 |
| 502 Meetings/Conventions | 12,599.94 | 120.00 | | | | | | | | 12,719.94 |
| Total 500 Advertising & Marketing | $13,520.94 | $2,558.16 | $3,532.99 | $349.52 | $719.83 | $548.83 | $1,019.00 | $619.00 | $619.00 | $23,487.27 |
| 505 Bank Charges & Fees | 672.00 | 1,020.00 | 1,025.52 | 298.00 | 40.00 | 70.00 | 124.00 | | 48.00 | 3,297.52 |
| 508 Broker Materials | | | 101.91 | | | | | | | 101.91 |
| 512 Computer Expense | | 884.16 | -300.00 | | | | | | | 584.16 |
| 514 Contractors | 7,929.17 | 8,666.68 | 8,666.68 | | | | | | | 25,262.53 |
| 520 Dues & subscriptions | | 25.00 | 25.00 | 25.00 | 25.00 | | | | | 100.00 |
| 525 Employer Taxes--General | 4,494.75 | 3,962.77 | 3,056.87 | 3,652.42 | 4,850.49 | 5,403.66 | 4,522.81 | 2,170.99 | 2,405.77 | 34,520.57 |
| 530 Employer Taxes--Software Development | 8,015.74 | 7,688.11 | 6,427.18 | 7,263.27 | 5,753.34 | 4,427.06 | 4,783.93 | 2,769.96 | 2,710.27 | 49,838.86 |
| 540 Insurance | 2,340.53 | 187.00 | 187.00 | 187.00 | 187.00 | 187.00 | 7,419.16 | 187.00 | 1,764.66 | 12,646.37 |
| 541 Insurance Premium Paid | 185,586.14 | 192,937.33 | 193,381.44 | 245,584.58 | 238,991.87 | 230,853.03 | 263,507.58 | 246,150.13 | 140,005.99 | 1,936,998.09 |
| 549 RNS Premiums Paid | | | | 335.20 | 295.20 | 295.20 | 255.20 | 295.20 | 295.20 | 1,771.20 |
| Total 541 Insurance Premium Paid | $185,586.14 | $192,937.33 | $193,381.44 | $245,919.78 | $239,287.07 | $231,148.23 | $263,762.78 | $246,445.33 | $140,301.19 | $1,938,769.29 |
| 543 Interest Paid | 17,631.86 | | | 20,155.00 | | | | | | 37,786.86 |
| 545 IT Services | 9,508.00 | 9,508.00 | 19,412.00 | 22,186.56 | 20,498.58 | 11,247.69 | 13,056.00 | 8,218.00 | 10,659.91 | 124,294.74 |
| 550 Legal & Professional Services (deleted) | | | | 111.99 | | | | | | 111.99 |
| 551 Meals & Entertainment | 2,860.49 | 120.00 | 477.24 | | 46.52 | 871.83 | | | | 4,376.08 |
| 553 Legal & Professional Fees | 39.99 | 39,612.63 | 79.98 | 610.99 | 39.99 | | | | 1,052.26 | 41,635.84 |
| 554 Professional Fees | | | 537.71 | | | | | | | 537.71 |
| 555 Office Equipment | | 34.95 | | | | | | | | 34.95 |
| 556 Office Supplies & Software | | | | | | | 4,054.80 | 2,834.93 | 1,137.90 | 8,027.63 |
| 556 Office Supplies & Software | 3,782.10 | 1,516.35 | 11,719.67 | 3,420.26 | 18,169.46 | 11,932.33 | 6,157.53 | 20,821.59 | 1,512.19 | 78,831.48 |
| 560 Office/General Administrative Expenses | 4,793.35 | 2,177.00 | 586.88 | 1,115.00 | 1,211.64 | 490.09 | 512.18 | 572.47 | 39.10 | 11,497.71 |
| 565 Parking | | | | | 8.00 | | | | | 8.00 |
| 567 Phone and Internet Charges | | 142.43 | 428.17 | | | | 507.89 | | 732.12 | 1,810.61 |
| 570 Postage | 15.59 | 1.40 | 1.10 | 127.13 | | 1.05 | 64.30 | 31.60 | | 242.17 |
| 580 Reimbursable Expenses | 3,431.58 | 770.00 | | | | | | | | 4,201.58 |
| 585 Rent & Lease | 23,282.20 | | 11,210.01 | 10,706.50 | 18,124.00 | 18,554.40 | 11,436.80 | 19,008.60 | 20,092.69 | 132,415.20 |
| 590 Salaries & Wages - General | 41,515.36 | 41,333.34 | 38,384.80 | 43,294.38 | 54,955.65 | 64,801.28 | 60,780.00 | 29,300.00 | 32,175.00 | 406,539.81 |
| 600 Salaries & Wages - Software Development | 77,792.56 | 87,789.28 | 83,313.28 | 96,733.28 | 83,733.30 | 83,983.30 | 86,701.24 | 46,637.47 | 46,204.14 | 692,887.85 |
| 610 Taxes & Licenses | 110.00 | | -146.92 | | | | 524.72 | 65.00 | 1,688.85 | 2,261.65 |
| Ask My Accountant | | | 1,585.12 | 5,012.60 | 5,543.70 | 934.22 | 4,800.00 | | | 17,875.64 |
| Employee Benefits | -1,784.09 | 10,391.28 | 5,509.44 | 5,032.17 | 4,768.54 | 5,288.46 | 8,119.20 | 50.59 | -2,130.34 | 35,245.25 |
| Total Expenses | $405,536.26 | $411,525.87 | $389,203.07 | $466,200.85 | $457,962.11 | $439,889.43 | $478,346.38 | $379,552.53 | $261,012.73 | $3,689,231.23 |
| Net Operating Income | $5,538.90 | $23,345.44 | -$15,617.93 | -$108,876.45 | -$180,978.30 | -$88,459.39 | -$19,356.48 | -$41,024.98 | $42,643.71 | -$382,785.48 |
| Net Income | $5,538.90 | $23,345.44 | -$15,617.93 | -$108,876.45 | -$180,978.30 | -$88,459.39 | -$19,356.48 | -$41,024.98 | $42,643.71 | -$382,785.48 |

## Schedule 3.9 – Absence of Changes

None.

## Schedule 3.11 – Claims and Litigation

- Threatened Litigation
  - Vericred, Inc. has threatened litigation over $59,531.25 of unpaid invoices, plus interest, costs, and attorney's fees, per a letter sent October 8, 2020

  - Jude Robert Shinn, former CEO of Candor USA, Inc. has threatened litigation over alleged unpaid salary and deferred salary. See attached letter from Oliver Maner LLP dated November 18, 2020

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

- Potential claims for violations of applicable Laws regarding late payment of wages and benefits

**<u>Schedule 3.12 – Insurance</u>**

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

*ACORD*®

# CERTIFICATE OF LIABILITY INSURANCE

CANDUSA-01   KADDISON

DATE (MM/DD/YYYY)
11/3/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Garner & Glover Company<br>135 E. Eighth Avenue<br>Rome, GA 30161 | CONTACT<br>NAME: | | |
|---|---|---|---|
| | PHONE<br>(A/C, No, Ext): (706) 291-7380 | | FAX<br>(A/C, No): (706) 234-8853 |
| | E-MAIL<br>ADDRESS: | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Hallmark Specialty Insurance Company | | |
| INSURED<br>Candor USA, Inc.<br>401 Broad St. Ste. 201<br>Rome, GA 30161 | INSURER B : Technology Insurance Company | | 42376 |
| | INSURER C : Admiral Insurance | | |
| | INSURER D : Lloyd's | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES        CERTIFICATE NUMBER:        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | ADDL INSD | SUBR WVD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | | | COMMERCIAL GENERAL LIABILITY | | | | EACH OCCURRENCE | $ 1,000,000 |
| | | | | CLAIMS-MADE X OCCUR | G10400064 | 12/26/2019 | 12/26/2020 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | POLICY PRO-JECT LOC | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | OTHER: | | | | | $ |
| | | | | AUTOMOBILE LIABILITY | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | ANY AUTO | | | | BODILY INJURY (Per person) | $ |
| | | | | OWNED AUTOS ONLY   SCHEDULED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | | | HIRED AUTOS ONLY   NON-OWNED AUTOS ONLY | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| | | | | UMBRELLA LIAB   OCCUR | | | | EACH OCCURRENCE | $ |
| | | | | EXCESS LIAB   CLAIMS-MADE | | | | AGGREGATE | $ |
| | | | | DED   RETENTION $ | | | | | $ |
| B | | | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y / N | TWC3912790 | 11/22/2020 | 11/22/2021 | X PER STATUTE   OTH-ER | |
| | | | N/A | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C | | | | Professional Errors | PGIARK09544 | 9/6/2020 | 9/6/2021 | Aggregate | 2,000,000 |
| D | | | | Cyber Privacy & Data | H20NGP203732 | 9/8/2020 | 9/8/2021 | Cyber | 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| MyHealthily Insurance Solutions, LLC<br>25 Rockwood Place<br>Suite 210<br>Englewood, NJ 07631 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br><br>*[signature]* |

ACORD 25 (2016/03)                    © 1988-2015 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

4817-4392-3922.2

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31



### CONFIRMATION OF COVERAGE BOUND
Business and Management (BAM)
Indemnity Insurance Coverage

| Producer: | Matt Baxter |
| Broker Company: | Burns & Wilcox - GA |

| Item 1. | Parent Company & Mailing Address: | CANDOR USA<br>2 East Bryan Street<br>Savannah, GA 31401 | Policy No:<br>Carrier: | EKI3354643<br>Scottsdale Indemnity Company |

Principal Address, if different from mailing address:

**Item 2.**   **Policy Period:** From 11/6/2020 to 11/6/2021
12:01 A.M. local time at Principal Address shown above.

**Item 3.**   Coverage Section and Limit of Liability

Directors and Officers and Company Coverage Section

1.   Limit of Liability:
   a.   $1,000,000  aggregate for all **Loss**, subject to 1.b. and 1.c. immediately below.
   b.   $1,000,000  additional aggregate for all **Loss** under Insuring Clause A.1., subject to 1.c. immediately below.
   c.   $2,000,000  maximum aggregate for this Coverage Section

2.   Retention:
   a.   $0  each **Claim** under Insuring Clause 1.
   b.   $25,000  each **Claim** under Insuring Clause 2.
   c.   $25,000  each **Claim** under Insuring Clause 3.

3.   Continuity Date: 11/06/2020

Your Policy includes an exclusive D&O Risk Management Service
that offers insureds the ability to ask their specific D&O related or
business owner questions directly to attorneys practicing in this field
of law. Insureds have unlimited, direct access to these practicing
attorneys. An Online Resources Center is also available. To learn
more about the D&O Risk Management Service, please visit:
www.ERiskMgmtResources.com or contact an E-Risk D&O Risk
Solutions representative at 877-568-6656.

| Item 4. | Premium: | $4,185 |

*Page 1 of 3*

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

| | | | | |
|---|---|---|---|---|
| Item 5. | Discovery Period options: | | | |
| | 1.  One (1) year = | 100% | of the premium | |
| | 2.  Two (2) years = | 150% | of the premium | |
| | 3.  Three (3) years = | 200% | of the premium | |
| | As provided in Section H, of the General Terms and Conditions, only one of the above Discovery Period options may be elected and purchased. | | | |
| Item 6. | Run-Off Period | | | |
| | 1.  One (1) year = | 125% | of the premium | |
| | 2.  Two (2) years = | 145% | of the premium | |
| | 3.  Three (3) years = | 165% | of the premium | |
| | 4.  Four (4) years = | 185% | of the premium | |
| | 5.  Five (5) years = | 205% | of the premium | |
| | 6.  Six (6) years = | 225% | of the premium | |
| | As provided in Section I, of the General Terms and Conditions, only one of the above Run-Off Period options may be elected and purchased. | | | |

| | |
|---|---|
| Item 7. | Forms and Endorsements Effective at Inception of Policy: |
| | 1.  EKI-D-1 (11/16) > Declarations |
| | 2.  HLPDO (1-18) > E-Risk Management Tools Center |
| | 3.  EKI-1 (04/08) > General Terms and Conditions |
| | 4.  EKI-P-1 (04/08) > Directors & Officers and Company Coverage Section |
| | 5.  EKI-782 (01/09) > Allocation Provision |
| | 6.  EKI-787 (01/09) > Amend Discovery Election-90 Days |
| | 7.  EKI-6 (04/08) > Amend Notice of Circumstances |
| | 8.  EKI-8 (04/08) > Amend Notice Provision - D&O |
| | 9.  EKI-199 (04/08) > Amend Other Insurance to be Primary - D&O |
| | 10.  EKI-14 (01/09) > Amend Outside Services Exclusion |
| | 11.  EKI-546 (11/09) > Amend Pollution Exclusion - Side A |
| | 12.  EKI-794 (01/09) > Amend Subrogation Provision - Final Judgment |
| | 13.  EKI-16 (04/09) > Amend Warranty Provision Non-Rescindable Coverage |
| | 14.  EKI-202 (04/08) > Amended Definition of Directors & Officers - Leased / Contracted Employees |
| | 15.  EKI-17 (03/16) > Amended Insured Versus Insured Exclusion |
| | 16.  EKI-545 (05/09) > Amended Insured Versus Insured Exclusion - Foreign Jurisdiction |
| | 17.  EKI-783 (01/09) > Amended Insured Versus Insured Exclusion with Creditor Committee Carveback |
| | 18.  EKI-2193-GA (1-20) > Amended Limit of Liability and Retentions-Georgia |
| | 19.  EKI-551 (1-15) > Cap on Losses from Certified Acts of Terrorism |
| | 20.  EKI-781 (01/09) > Cost of Investigations Coverage |
| | 21.  EKI-779 (01/09) > Delete Paragraph H. from Exclusion N. |
| | 22.  EKI-21 (04/08) > Employed Lawyers Extension |
| | 23.  EKI-785 (01/09) > Extradition Coverage Endorsement |
| | 24.  EKI-165 (04/08) > Professional Services Exclusion - Securities Holder Exception |
| | 25.  EKI-37 (04/08) > Removal of Alternative Dispute Resolution Provision |
| | 26.  EKI-19 (04/08) > Scientific And Advisory Board Extension |
| | 27.  EKI-4 (06/09) > State Amendatory Inconsistent |
| | 28.  EKI-796 (01/09) > Tolling or Waiving the Statute of Limitations |
| | 29.  EKI-777-GA (10/08) > Amendatory Endorsement - Georgia |
| | 30.  NOTI0601CW (11/18) > Policyholder Disclosure Notice of Terrorism Insurance Coverage |

| | |
|---|---|
| Item 8. | Subjectivities: |

Confirmation Issuance date: 11/13/2020
Note: This confirmation of coverage will expire 90 days from 11/13/2020

## Schedule 3.13 – Compliance with Laws

Seller is in material compliance with Laws and licenses.

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

WILLIAM P. FRANKLIN  JR.
DAVID H. DICKEY
. GREGORY HODGES
ROBERT W. SCHIVERA (GA & NC)
PATRICK T. O'CONNOR
JAMES P. GERARD
PATRICIA T. PAUL
TIMOTHY D. ROBERTS
LEE A. SUMMERFORD
ANDREW M. WILKES
WILLIAM J. HUNTER
BENJAMIN M. PERKINS (GA & FL)
PAUL H. THRELKELD
GEORGE T. MAJOR, JR
JACOB D. MASSEE (GA & CO)
T. LAWRENCE EVANS
R. BENJAMIN LINGLE
BRYAN A. SCHIVERA (GA & SC)
DAVID B. MULLENS, III
I. WILLIAM DROUGHT, III
J. RYAN BEASLEY
GRACIE G. SHEPHERD
STUART F. SUMNER
S. CHASE PARKER (GA,SC,TN)
K. ELIZABETH HOLLAND
BRIAN D. GRIFFIN



O L I V E R
M A N E R
LLP

A T T O R N E Y S   A T   L A W

218 WEST STATE STREET
SAVANNAH, GEORGIA 31401

POST OFFICE BOX 10186
SAVANNAH, GA 31412

TELEPHONE (912) 236-3311
FACSIMILE (912) 236-8725
WWW.OLIVERMANER.COM

TWIGGS & OLIVER
1907-1918

OLIVER & OLIVER
1909-1943

OLIVER, OLIVER & DAVIS
1943-1955

OLIVER, DAVIS & MANER
955-1963

OLIVER & MANER
1963-1967

OLIVER MANER & GRAY
1967-2008

JULIAN R. FRIEDMAN
OF COUNSEL

November 18, 2020

**Via Email Only, Delivery and Read Receipt Requested**
Candor USA, Inc.
c/o Mark Shirman (via email to ~~mark.shirman@candorusa.com~~ and ~~mshirman@candorusa.com~~);
Kirk Lusk (via email to ~~kirk.lusk@candorusa.com~~);
Kim McCauley (via email to ~~kim.mccauley@candorusa.com~~)
Ken Anketell (via email to ~~ken@candorusa.com~~);
Matthew Applestein (via email to ~~matthew.applestein@candorusa.com~~);
Jim Prokes (via email to ~~jim.prokes@candorusa.com~~);
Pam Nelson (via email to ~~pam.nelson@candorusa.com~~)

RE:   Jude Robert Shinn – Unpaid Deferred Salary and Severance

Dear Members of the Board of Directors of Candor USA, Inc.:

Please be advised that Dale Akins and I have been retained to represent Jude Robert Shinn in connection with the collection of monies owed to him by Candor USA, Inc. If Candor USA, Inc. is represented by counsel with regard to the matters referenced herein, please forward a copy of this letter to them and ask that he/she contact me as soon as possible. This letter constitutes a formal demand by Mr. Shinn for payment of his deferred/unpaid salary as well as demand for payment of the severance benefits he is entitled to receive under the terms of his employment agreement. I understand that Mr. Shinn has made a prior written demand to Candor USA, Inc. for payment of the amounts owed to him and that no payment has been made.

As you all know, Mr. Shinn was involved with Candor USA, Inc. from its inception in March 2017 through the time that the Board of Candor USA, Inc. opted to suspend and therefore breached his employment agreement in September 2020. At all times relevant, Mr. Shinn worked for Candor USA, Inc. for an agreed upon yearly salary of $348,000.00. During that time of his employment with Candor USA, Inc., Mr. Shinn deferred a total of thirty-one (31) months of salary which remains unpaid. In addition, Candor USA, Inc. failed to pay Mr. Shinn for the final two pay periods of his employment. The total amount owed by Candor USA, Inc. to Jude Robert Shinn for unpaid salary (31 months of deferred salary + 1 month of unpaid salary) is $928,000.00.

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

Additionally, Mr. Shinn's employment agreement with Candor USA, Inc. provides for payment of severance pay equal to six months salary upon termination of the employment agreement. Candor USA, Inc. terminated and therefore breached Mr. Shinn's employment agreement when it ceased making salary payments to him and when it notified him that his employment with Candor USA, Inc. was being suspended. Mr. Shinn is owed $174,000.00 in severance pay by Candor USA, Inc.

The total amount owed to Jude Robert Shinn by Candor USA, Inc. is $1,102,000.00 (32 months of salary + six months of severance). This letter is a formal demand by Jude Robert Shinn for payment of this amount by 12:00 noon on November 25, 2020. Payment of the amounts owed shall be made via cashier's check, certified check, or other payment device as may be specifically agreed upon by Mr. Shinn. Such draft shall be made payable to "Jude Robert Shinn and his attorneys Oliver Maner LLP" and must be received by my office no later than 12:00 noon on November 25, 2020.

Should you have any questions, please do not hesitate to call.

Sincerely,

OLIVER MANER LLP

GEORGE T. MAJOR, JR.

GTM
Cc:     Jude Robert Shinn
        Dale Akins, Esq.

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

**Schedule 3.12 – Insurance**

| ACORD | CERTIFICATE OF LIABILITY INSURANCE | CANDUSA-01 | KADDISON |
| --- | --- | --- | --- |
| | | | DATE (MM/DD/YYYY) 11/3/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME | |
| --- | --- | --- |
| Garner & Glover Company 135 E. Eighth Avenue Rome, GA 30161 | PHONE (A/C, No. Ext): (706) 291-7380 | FAX (A/C, No): (706) 234-8853 |
| | E-MAIL ADDRESS: | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A: Hallmark Specialty Insurance Company | |
| INSURED | INSURER B: Technology Insurance Company | 42376 |
| Candor USA, Inc. 401 Broad St. Ste. 201 Rome, GA 30161 | INSURER C: Admiral Insurance | |
| | INSURER D: Lloyd's | |
| | INSURER E: | |
| | INSURER F: | |

**COVERAGES**  CERTIFICATE NUMBER:  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| A | X COMMERCIAL GENERAL LIABILITY | | | G10400064 | 12/26/2019 | 12/26/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED RETENTION $ | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | | TWC3912790 | 11/22/2020 | 11/22/2021 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N/A | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C | Professional Errors | | | PGIARK09544 | 9/8/2020 | 9/8/2021 | Aggregate | $ 2,000,000 |
| D | Cyber Privacy & Data | | | H20NGP203732 | 9/8/2020 | 9/8/2021 | Cyber | 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
| --- | --- |
| MyHealthIy Insurance Solutions, LLC 25 Rockwood Place Suite 210 Englewood, NJ 07631 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

ACORD 25 (2016/03)  © 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

4817-4392-3922.2

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31



**E Risk**
Services, LLC

**CONFIRMATION OF COVERAGE BOUND**
Business and Management (BAM)
Indemnity Insurance Coverage

| Producer: | Our Basis |
| Broker Company: | Burns & Wilcox - GA |

| Item 1. | Parent Company & Mailing Address: | CARLOUR USA<br>2 East Bryan Street<br>Savannah, GA 31401 | Policy No: | EKI3954643 |
| | | | Carrier: | Scottsdale Indemnity Company |

| | Principal Address, if different from mailing address: |

| Item 2. | Policy Period: From 11/6/2020 to 11/6/2021 |
| | 12:01 A.M. local time at Principal Address shown above. |

| Item 3. | Coverage Section and Limit of Liability |

Directors and Officers and Company Coverage Section

1. Limit of Liability:
   a. $1,000,000 aggregate for all Loss, subject to 1.b. and 1.c. immediately below.
   b. $1,000,000 additional aggregate for all Loss under Insuring Clause A..., subject to 1.c. immediately below.
   c. $2,000,000 maximum aggregate for this Coverage Section
2. Retention:
   a. $0 each Claim under Insuring Clause 1
   b. $25,000 each Claim under Insuring Clause 2.
   c. $25,000 each Claim under Insuring Clause 3.
3. Continuity Date: 11/06/2020

Your Policy includes an exclusive D&O Risk Management Service
that offers Insureds the ability to ask their specific D&O related or
business owner questions directly to attorneys practicing in this field
of law. Insureds have unlimited, direct access to these practicing
attorneys. An Online Resource Center is also available. To learn
more about the D&O Risk Management Service, please visit
www.ERiskMgmtResources.com or contact an E-Risk D&O Risk
Solutions representative at 877-568-6855.

| Item 4. | Premium: | $4,188 |

Page 1 of 3

DocuSign Envelope ID: DA0113F1-B741-44AC-AE57-CF85668F3F31

| Item 5. | Discovery Period options: | | |
|---|---|---|---|
| | 1. One (1) year = | 100% | of the premium |
| | 2. Two (2) years = | 150% | of the premium |
| | 3. Three (3) years = | 200% | of the premium |
| | As provided in Section H, of the General Terms and Conditions, only one of the above Discovery Period options may be elected and purchased. | | |

| Item 6. | Run-Off Period: | | |
|---|---|---|---|
| | 1. One (1) year = | 125% | of the premium |
| | 2. Two (2) years = | 145% | of the premium |
| | 3. Three (3) years = | 165% | of the premium |
| | 4. Four (4) years = | 165% | of the premium |
| | 5. Five (5) years = | 205% | of the premium |
| | 6. Six (6) years = | 225% | of the premium |
| | As provided in Section I, of the General Terms and Conditions, only one of the above Run-Off Period options may be elected and purchased. | | |

| Item 7. | Forms and Endorsements Effective at Inception of Policy: |
|---|---|
| | 1. EKI-D-1 (11/98)  >  Declarations |
| | 2. HL-PDQ (11/98)  >  Ex-Risk Management Tools Center |
| | 3. EKI-1 (04-06)  >  General Terms and Conditions |
| | 4. EKI-D-1 (04/06)  >  Directors & Officers and Company Coverage Section |
| | 5. EKI-782 (01/09)  >  Allocation Provision |
| | 6. EKI-787 (01/09)  >  Amend Discovery Period 90 Days |
| | 7. EKI-4 (01/09)  >  Amend Notice of Circumstances |
| | 8. EKI-9 (04/06)  >  Special Notice Provision - UWD |
| | 9. EKI-199 (06/00)  >  Amend Other Insurance to be Primary - D&O |
| | 10. EKI-14 (07/00)  >  Amend Outside Services Exclusion |
| | 11. EKI-646 (11/09)  >  Amend Pollution Exclusion - Side A |
| | 12. EKI-734 (01/06)  >  Amend Subrogation Provision - Final Adjudicat |
| | 13. EKI-16 (11/09)  >  Amend Warranty Provision Non-Rescindable Coverage |
| | 14. EKI-782 (04/06)  >  Amended Definition of Directors & Officers - Leased / Contracted Employees |
| | 15. EKI-17 (09/10)  >  Amended Insured Versus Insured Exclusion |
| | 16. EKI-945 (06/06)  >  Amended Insured Versus Insured Exclusion - Foreign Jurisdiction |
| | 17. EKI-780 (04/06)  >  Amended Insured Versus Insured Exclusion with Creditor Committees Carveback |
| | 18. EKI-2100-GA(11-08)  >  Amended Limit of Liability and Retentions-Georgia |
| | 19. 150-55 (11/15)  >  Cap on Losses from Certified Acts of Terrorism |
| | 20. EKI-781 (01/09)  >  Cost of Investigations Coverage |
| | 21. EKI-773 (01/00)  >  Delete Paragraph g. from Exclusion 9. |
| | 22. EKI-21 (04/06)  >  Employer Liability Extension |
| | 23. EKI-786 (01/09)  >  Extradition Coverage Endorsement |
| | 24. EKI-165 (04/06)  >  Professional Services Exclusion - Securities Holder Exception |
| | 25. EKI-37 (04/06)  >  Removal of Alternative Dispute Resolution Provision |
| | 26. EKI-19 (04/06)  >  Scientific And Advisory Board Extension |
| | 27. EKI-846 (06/09)  >  State Amendatory Inconsistent |
| | 28. EKI-786 (01/09)  >  Tolling or Waiving the Statute of Limitations |
| | 29. EKI-277-GA (M/99)  >  Amendatory Endorsement - Georgia |
| | 30. NOT13931GW (11/96)  >  Policyholder Disclosure Notice of Terrorism Insurance Coverage |

| Item 8. | Subjectivities: |
|---|---|
| | |

Confirmation issuance date: 11/13/2020
Note: This confirmation of coverage will expire 90 days from 11/13/2020

## Schedule 3.13 – Compliance with Laws

Seller is in material compliance with Laws and licenses.

4817-4392-3922.2